**UNITED STATES of America,
Appellant,**

v.

**Barbara J. CURZI, Defendant, Appellee.**

**No. 88–1893.**

United States Court of Appeals,
First Circuit.

Heard Nov. 1, 1988.
Decided Jan. 30, 1989.

Before BOWNES, BREYER and SELYA, Circuit Judges.

SELYA, Circuit Judge.

Barbara Curzi–Laaman (Curzi), defendant-appellee, asked the United States District Court for the District of Massachusetts to suppress certain evidence. The district court obliged.[1] *United States v. Levasseur*, 699 F.Supp. 995 (D.Mass.1988) (D.Ct.Op.). The United States appeals pursuant to 18 U.S.C. § 3731.

## I. BACKGROUND

There is surprisingly little dispute concerning the salient facts. We summarize them at this juncture, referring the reader with broader interests to our earlier opinion regarding the same indictment. *See United States v. Levasseur*, 846 F.2d 786 (1st Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 232, 102 L.Ed.2d 222 (1988).

The evidence which the district court suppressed was seized from Curzi's home in November 1984. At that time, she was thought to be a member of a terrorist cabal which had claimed responsibility for a series of bombings—but no charges were pending against her. Federal warrants were outstanding for several other alleged gang members: Jaan Laaman (appellee's spouse), Richard Williams, Raymond Levasseur, Thomas Manning, and Carol Manning. These persons were wanted, variously, on charges of interstate flight to avoid prosecution for murder and-or attempted murder, bank robbery, and the like. A flyer issued by the Federal Bureau of Investigation (FBI) warned that the group was "known to use automatic weapons" and that its members were "considered ... extremely dangerous."

In the course of an ongoing manhunt for the terrorists, the FBI spotted Patricia Gros, another suspected gang member. Agents tracked her to a dwelling in Deer-

Michael K. Loucks, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., and David L. Douglass, Asst. U.S. Atty., were on brief, for appellant.

Linda J. Thompson, with whom, Thompson, Thompson & Jacobson, was on brief, for appellee.

1. The suppression hearing was held on February 23, 1988. On June 20, in an *ore tenus* bench decision, the court excluded the evidence, filing its written opinion some 10 weeks thereafter. The scope of our review differs from the lower court's in three particulars: the matters considered in Part II of the opinion below, D.Ct.Op. at 1003–08, are not before us; the claims of Curzi's husband, Jaan Laaman, are moot (the charges against him having been dropped); and the collateral estoppel theory argued to, and rejected by, the district court, *see id.* at 997 & nn. 1–3, has been abandoned.

field, Ohio which she shared with Levasseur. Surveillance was established. Agents saw Williams leave the Gros/Levasseur residence in his car on the evening of November 3, 1984. He was followed to Cleveland and trailed to the "4200 block" on West 22d Street. Although the agents did not see which building Williams entered, they cordoned off the entire block during the night. A cadre of law enforcement officers was assembled, including SWAT teams from as far away as Pittsburgh.

Early on the morning of November 4, the FBI received a telephone-trace report which showed that Williams, while en route to Cleveland, had called 4248 W. 22d St. At this point—approximately 8:00 a.m.—official attention focused on the single family home at that address. The surrounding houses were evacuated and more than 35 officers, all armed and many clad in bulletproof vests, took their places. Roughly half an hour later, at about 8:30 a.m., Williams's hideaway was precisely confirmed: agents saw him leave the house, retrieve something from his parked car, and reenter the premises. The dragnet remained in place. No endeavor was made to procure a search warrant, but there was an attempt to ascertain the homeowner's identity. The agents were able to learn that the telephone number which Williams had called was listed to one Lisa Owens. The name meant nothing to the FBI; the agents could not connect it with the gang or with any criminal activity. They remained completely in the dark as to whether anyone other than Williams was on the premises.

By 10:15 a.m., there had been no material change in circumstances. The FBI chose that moment, however, to escalate the drama into its next stage. An agent telephoned Owens's number and ordered the "occupants"—whoever they might prove to be—to exit. After a short delay, during which several more orders were issued, three children debouched; Williams, Curzi, and Laaman soon followed. The adults were immediately arrested (the two men on outstanding warrants; appellee on a charge of harboring). Without pausing, the agents entered the dwelling and carried out a security check. They found guns and explosives in plain sight. Later, the FBI obtained a warrant authorizing a full-scale search of the premises. The underlying affidavit relied heavily upon Laaman's arrest outside the house and the items discovered in the course of the protective sweep.

In May 1986, appellee and her alleged fellow gang members were indicted on various charges of racketeering and conspiracy. *See United States v. Levasseur*, 846 F.2d at 791. The defendants, Curzi included, filed pretrial motions to suppress the evidence seized from 4248 W. 22d St. The district court ruled that Curzi had standing to object to the search and seizure, D.Ct.Op. at 999; that "the order to evacuate the house ... constitu[ted] a search," *id.* at 999; that the order was not buttressed by exigent circumstances, ergo, illegal, *id.* at 999–1000; and that, absent the tainted fruits of the invalid exit order, the warrantless protective sweep was also unlawful. *Id.* at 1000–02 & nn. 5–6. The court held the later, warrant-backed search to be illegitimate as well: "The problem with this latter search is that the government's affidavit, shorn of the unlawfully obtained information, fails to establish a sufficient nexus between the items to be seized and the place to be searched." *Id.* at 1001. Accordingly, the district court allowed the motion to suppress evidence seized at 4248 W. 22d St. as to appellee. *Id.* at 1008.

It is against this backdrop that we canvass the record and the applicable law in order appropriately to address the questions posed. Notwithstanding that we differ from the district court in our approach to the problem, we affirm the order excluding the evidence. On this appeal, all roads lead to Rome.

## II. THE OFFICERS' CONDUCT

We review what we believe to be the controlling Supreme Court precedent, and then proceed to evaluate the officers' conduct in that light.

### A.

Any reasoned analysis of the issues presented on appeal must begin with the Supreme Court's opinion in *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). There, federal agents, following a tip from a confidential informant, used a telephone number to locate an address where a fugitive (Lyons) was reported to be staying. Two days later, with an arrest warrant for Lyons in hand (but no search warrant), the agents went to the locus. They encountered Steagald and another man in front of the building, frisked them, and determined that neither man was Lyons. The agents thereupon entered the building (Steagald's home) and searched it without consent. The fugitive was not found, but drugs were spotted. Steagald was charged in connection with possession of the contraband. *Id.* at 206–07, 101 S.Ct. at 1644–45. The Court held that the search violated defendant's fourth amendment rights. *Id.* at 216, 101 S.Ct. at 1650. The evidence was, therefore, suppressed.

In *Steagald*, the Court ruled that obtaining an arrest warrant for A was not sufficient to authorize B's home to be entered and searched in the course of effecting A's apprehension. In other words, the arrest warrant was inadequate protection for the privacy rights of a resident not named therein. 451 U.S. at 213, 101 S.Ct. at 1648. The Court deemed the intervention of a neutral judicial officer absolutely necessary to guard against "a significant potential for abuse." *Id.* at 215, 101 S.Ct. at 1649. Absent such a requirement, "[a]rmed solely with an arrest warrant for a single person, the police could search all the homes of that individual's friends and acquaintances." *Id.* Thus, apart from consent or exigent circumstances, *Steagald* requires a search warrant before one's home can be searched for a third person who is the subject of an arrest warrant. *Id.* at 213–14, 101 S.Ct. at 1648.

*Steagald*, we believe, controls. To be sure, the cases are not on all fours. Here, unlike in *Steagald*, the agents gave an order to exit before entering the home; and, in contrast to a full-blown search, they performed only a protective sweep.[2] Yet the overpowering similarity between the cases stems from the fact that the only warrant which the agents possessed was for a third person's arrest.[3] It is no answer to say that the agents had probable cause to believe Williams was inside the dwelling; *Steagald* requires not only probable cause that the subject of the arrest warrant is within the place to be invaded, but also that a neutral judicial officer make this determination and issue a search warrant. No such protocol was followed here.

### B.

Before us, the government employs a divide-and-conquer strategy. It splits the

---

2. When we allude to a protective sweep, we refer, in general, to the right of arresting officers to conduct a limited search of part or all of the premises in question for purposes of security or evidence preservation. We agree, in principle, with the Second Circuit's formulation of the protective sweep doctrine:

   Law enforcement officers may conduct a security check—a quick and limited pass through the premises to check for third persons—without a warrant when making an arrest on private premises when they reasonably fear that other persons are lurking within who may pose a threat to their safety or are likely to destroy evidence.

   *United States v. Escobar*, 805 F.2d 68, 71 (2d Cir.1986). *See generally United States v. Gerry*, 845 F.2d 34, 36 (1st Cir.1988); *United States v. Veillette*, 778 F.2d 899, 902 & n. 1 (1st Cir.1985), *cert. denied*, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986). That there may be minor variations among the circuits, *see* Comment, *Clean Sweeps: Protecting Officer Safety and Preventing the Imminent Destruction of Evidence*, 55 U.Chi.L.Rev. 684, 697 & n. 57 (1988), is immaterial for the purposes at hand.

3. The record indicates that there was also an outstanding arrest warrant for Laaman, appellee's husband and a resident of 4248 W. 22d St. An arrest warrant "carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980). The Laaman arrest warrant, however, does not avail appellant. The district court found, and the government concedes, that the agents, prior to the order to exit and the ensuing arrest, "did not ... have probable cause to believe that any ... individual they were seeking [other than Williams] was inside the house." D.Ct.Op. at 998.

conduct of the officers into two segments. The first part of the proposition focuses only on the order to evacuate the premises; that order, appellant says, was neither a search nor a seizure, and thus required no warrant. The second part of the proposition is then brought to bear: once three members of the terrorist band had emerged, the known presence of demonstrably dangerous suspects rendered it reasonable to conduct a protective sweep of the premises, especially because a supportable inference that Laaman and Curzi were in residence arose at that time. To a point, the district court played the government's game; it accepted the segmentation, but proceeded to rule that each component was illegal. *See, e.g.,* D.Ct.Op. at 1000 (order to exit "effectively and practically constituted a search ... and ... was unlawful"); *id.* at 1001 (protective sweep unlawful).

This approach, we think, ignores the stark reality of events. While a spontaneous order to exit, unaccompanied by a predetermined plan to enter the premises as soon as they are evacuated, might well, as the prosecution argues, raise a different set of concerns, that is not this case. On the facts at hand, we cannot view the order to exit and the protective sweep as independent phenomena. As opposed to being scissile, they were inseparable parts of an integrated whole. They should be treated as such. Thus, unlike the court below, we express no opinion upon the lawfulness *vel non* of either procedure, standing alone.

The linkage is made manifest by the officers' overall plan. The central element—the fact of calculated predesign—cannot seriously be questioned. In the first place, the agents could safely have arrested Williams while he was driving, unaccompanied, from Deerfield to Cleveland. They elected, instead, to follow him. The uncontradicted evidence revealed the rationale for this tactical choice: the FBI wanted "to surveil [Williams] to where he ultimately would go to attempt to apprehend [*sic*] the arrest of the gang...." Record Appendix (R.A.) 129.

In the second place, the officers had a golden opportunity to arrest Williams when he appeared, alone and apparently unarmed, outside 4248 W. 22d St. at roughly 8:30 a.m. They eschewed that opportunity in favor of a plan which would net them the other occupants of the house—if there proved to be any—and access to the premises for the anticipated sweep.[4] Lest there be any doubt, we note that Richard Schwein, the agent in charge of the surveillance team, testified that the sweep of the house following Williams's arrest was "planned in advance." R.A. 163. A full two hours before the order to exit was given, Schwein instructed his forces to the following effect:

> When the time came to make the arrest, we could call in on the phone, order the occupants out, and I would, also give orders over the PA system. We put SWAT teams on each side of the house, behind it, in front of it and the armored rescue vehicle, *take out the occupants, secure everybody, then sweep the house.*

*Id.* at 161 (emphasis supplied). In view of these indisputable facts, the government's attempt to isolate the order to exit and argue that it gave rise to exigent circumstances justifying the subsequent protective sweep amounts to little more than sophisticated bootstrapping. It cannot succeed.

This is not a case where officers in hot pursuit cornered dangerous criminals and were compelled to act on the spur of the moment. Rather, though the quest was hazardous, at the end the agents enjoyed the luxury of time and the opportunity for careful reflection. Instead of acting in the heat of the chase, they were able to indulge in cool premeditation as to the tactics to be employed in Williams's arrest. The uncontested evidence is that the law enforcement personnel planned, well ahead of time, to order not just Williams but all the occupants of the dwelling to exit, and then to conduct the protective sweep, come what might.

---

**4.** When the FBI decided to pull the plug, the agents also abjured the option of ordering Williams alone to exit, instead ordering all occupants to leave the premises.

The point is, we think, so basic that we need not linger long in its exposition. The unreasonable search of a person's home is the "chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972), and the "zone of privacy [is nowhere] more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home." *Payton v. New York*, 445 U.S. 573, 589, 100 S.Ct. 1371, 1381–82, 63 L.Ed. 2d 639 (1980). Therefore, warrantless searches of a dwelling-place are presumptively unreasonable unless the police can prove consent or the existence of exigent circumstances. *See Arizona v. Hicks*, 480 U.S. 321, 327, 107 S.Ct. 1149, 1154, 94 L.Ed. 2d 347 (1987); *Coolidge v. New Hampshire*, 403 U.S. 443, 474–75, 91 S.Ct. 2022, 2042–43, 29 L.Ed.2d 564 (1971); *United States v. Moore*, 790 F.2d 13, 15 (1st Cir. 1986); *United States v. Baldacchino*, 762 F.2d 170, 176 (1st Cir.1985). The circumstances which excuse failure to obtain a warrant are "few in number and carefully delineated," *United States v. United States District Court*, 407 U.S. at 318, 92 S.Ct. at 2137, especially where one's home is concerned. *See Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S.Ct. 2091, 2098, 80 L.Ed. 2d 732 (1984).

We cannot remain faithful to these noble precepts if we permit the government to do by wordplay what it is clearly prohibited from doing in actuality—intruding into an individual's home to search it on the sole basis of an arrest warrant naming a third person who is not reasonably thought to be in residence. To allow the authorities to avoid *Steagald* compliance by the simple expedient of subdividing an essentially impartible course of conduct into factitious segments would make a mockery of the important constitutional protections carefully crafted by the Framers and clearly articulated by the Court. In this case, the sum of the parts equals the whole. Because the federal agents knew in advance that they would be entering the home to conduct a search, regardless of who or what the order to exit yielded, *Steagald*

required that, absent consent or exigent circumstances, a search warrant be procured.

## III. EXIGENT CIRCUMSTANCES

The Supreme Court has not recognized any general "protective sweep" exception to the warrant requirement. *See generally* Comment, *Clean Sweeps: Protecting Officer Safety and Preventing the Imminent Destruction of Evidence*, 55 U.Chi.L.Rev. 684 (1988). Nor has this court sought to create one. Our view has been—and remains—exactly opposite: "a 'protective sweep' is 'no more lightly taken than any other instance where the government seeks to justify an unwarranted search.'" *United States v. Gerry*, 845 F.2d 34, 36 (1st Cir.1988) (quoting *United States v. Hatcher*, 680 F.2d 438, 443 (6th Cir.1982)). Without benefit of search warrants, security sweeps are constitutionally impermissible unless (a) supported by probable cause, and (b) justified by consent, exigency, or some other acceptable reason for bypassing the usual constraints of the fourth amendment. *See United States v. Gerry*, 845 F.2d at 36; *United States v. Veillette*, 778 F.2d 899, 902–03 (1st Cir. 1985), *cert. denied*, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986). In this case, there was no consent to the search. The prosecution claims, however, that the agents had probable cause and were faced with an exigency sufficient to permit the interdicted activity (the combined order to exit and ancillary protective sweep). We examine this contention insofar as it relates to the presence or absence of exigent circumstances.

Our precedent teaches that we must ascertain "whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." *United States v. Adams*, 621 F.2d 41, 44 (1st Cir.1980); *accord United States v. Gerry*, 845 F.2d at 36; *United States v. Cresta*, 825 F.2d 538, 553 (1st Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988). To effectuate this inquiry, we consider factors such as the following: "the gravity of the underlying

offense; whether delay poses a threat to police or the public safety; whether there is a *great* likelihood that evidence will be destroyed if there is a delay until a warrant can be obtained." *United States v. Veillette*, 778 F.2d at 902 (emphasis in original); *see also United States v. Baldacchino*, 762 F.2d at 176. The court below applied the proper test and found specifically that no cognizable exigency had arisen. D.Ct.Op. at 999. In its judgment, "sufficient time existed to obtain a search warrant for the premises once [the house was] identified by tracing back the phone call." *Id.* at 998. Moreover, the timing of the order to exit was of the FBI's own choosing and was "not prompted by any activity in the house or any exigent circumstances known to the police." *Id.* at 1000. We review these findings with some deference. Although we afford plenary oversight to the district court's ultimate conclusion, we are bound by the court's subsidiary factfinding unless it proves to be clearly erroneous. *See, e.g., United States v. Figueroa*, 818 F.2d 1020, 1024 (1st Cir.1987); *United States v. Moore*, 790 F.2d at 15; *United States v. Baldacchino*, 762 F.2d at 175. In our view, the judge's findings are unimpugnable.

▆▆▆▆ The government's litany of exigent circumstances includes the following: the seriousness of the underlying offense for which Williams was sought; the grave risk to public safety stemming from the wanted man's demonstrated proclivity toward violence; the dangers inherent in attempted capture of such an individual; the fear that Williams could escape if not swiftly apprehended; the sinister reputation and record of Williams's fellow fugitives; and the gang's anarchic bent.[5] But accepting these at face value, the prosecution is still undone. The simple fact of the matter is that each and all of the claimed extenua-

tions existed from the time the FBI tracked Williams to 4248 W. 22d St. At the latest, the agents' relevant knowledge was complete by 8:30 a.m. on the morning of the search. That they waited for almost two hours before bringing the operation to its planned climax belies the government's contention that the risks were such as would "not brook the delay of obtaining a warrant." *Gerry*, 845 F.2d at 36. Time was ample; manpower abounded; the premises were surrounded and secured; the neighbors had been led to safety; the drama was being played out during daylight hours and in an urban setting. All in all, the situation was in good control. There is simply no credible evidence to suggest that obtaining a search warrant would have increased the risk of violence, escape, or destruction of evidence—or even delayed the search.

The cases cited by the government are uniformly inapposite. We deign to discuss but two of them. In *United States v. Cresta, supra,* we held that there were exigent circumstances to justify the warrantless entry into defendants' hotel room, and their arrest, notwithstanding that probable cause existed prior to the time that exigent circumstances arose. 825 F.2d at 553. There, however, an emergency arose—wholly apart from volitional acts of the FBI team which had placed defendants under observation. *Id.* In the case at bar, unlike in *Cresta*, no new exigency blossomed between deployment of the officers and announcement of the order to exit. The reverse is true. The district court found, supportably, that the "decision to move was not prompted by any activity in the house or any exigent circumstances known to the police officers beyond the exigency of enforcing the law and appre-

---

**5.** The government also argues on appeal that the arrests of Gros and Levasseur at their Deerfield home on the morning of November 4th created exigent circumstances because of the danger that "someone" would telephone the "Owens" house and warn Williams (who might then have attempted to flee or destroy evidence). The argument will not wash. In the first place, it was not made below. In the second place, none

of the members of the Cleveland raiding party testified that they knew of, let alone considered, the Deerfield arrests when orchestrating and implementing the Cleveland operation. Thirdly, there was no evidence to suggest that anyone still at large was in a position to have known, within the appropriate time frame, of both Levasseur's arrest and Williams's whereabouts, and so to have sounded the alarm.

hending Williams." D.Ct.Op. at 1000. That exigency, of course, existed all along.[6]

The prosecution's reliance on *United States v. Edwards,* 602 F.2d 458 (1st Cir. 1979) is similarly misplaced. In *Edwards,* we detected exigent circumstances adequate to justify warrantless entry where "government agents could not have obtained a search warrant for [defendants'] home" earlier, *id.* at 468, and "legitimately could fear that [defendants] had discovered their surveillance and would destroy the [evidence] before a search [warrant] could be obtained." *Id.* at 469. In contrast, the FBI in this case set the timetable. It was Schwein who designed the tactics and elected to reveal the agents' presence at a particular moment. There was no evidence to indicate that Williams or any other occupant of the dwelling had discovered the surveillance.[7] The case at bar, therefore, is more nearly akin to *United States v. Munoz-Guerra,* 788 F.2d 295 (5th Cir. 1986), where agents realized in advance that once they made their presence known, a security search would be necessary. Given that knowledge, the only viable question was whether exigent circumstances justified the agents' initial decision to reveal their presence. *Id.* at 298. That question is easily answered here: there were none. Prior to ordering the occupants to exit, resort to a magistrate was altogether feasible. The decision to forgo this simple step was inexcusable.

We bring this part of our opinion to a close. It was Curzi's home into which the authorities intruded. The agents did not know that she lived in the house or was there when Williams arrived. They were similarly unaware of Laaman's residency and presence. Appellee was clearly entitled to the protection the warrant requirement of the fourth amendment provides: an impartial ascertainment of probable cause by a judicial officer, focusing on either the house or some person living therein. She was deprived of that right, and the government has failed to excuse the deprivation. The district court's conclusion that there was no saving exigency is supported by the evidence.

## IV. POTPOURRI

The government offers a potpourri of other arguments why, even absent exigent circumstances, the avails of its egress order and protective search should not be suppressed. We find none of these exhortations convincing.

### A.

■ Appellant contends that the official overreaching which occurred was immaterial; the evidence would have been discovered sooner or later. Thus, the prosecutorial thesis runs, the evidence is salvageable under the rule of *Nix v. Williams,* 467 U.S. 431, 448, 104 S.Ct. 2501, 2511, 81 L.Ed.2d 377 (1984) (when evidence "would inevitably have been discovered without reference to the police ... misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible"). Yet—whether or not discovery of the evidence was sure to occur—one thing appears fairly certain: this particular fulguration comes too late. The government failed to make the argument below.

---

6. We agree with the lower court that, after the order to exit was obeyed and the presence of Curzi and Laaman revealed, there may well have existed exigent circumstances to justify the protective sweep. *See* D.Ct.Op. at 1000. We need not explore where this might lead, however, because of our determination that the evacuation order and the ensuing sweep were part and parcel of a unitary intrusion. *See supra* Part II(B). Moreover, on any view of the case, whatever extenuations stemmed from the exit order were of the FBI's own making—ultroneous, one might say. Circumstances deliberately created by the police themselves cannot justify a warrantless search. *See Cresta,* 825 F.2d at 553; *see also United States v. Morgan,*

743 F.2d 1158, 1163 (6th Cir.1984) ("Police officials ... are not free to create exigent circumstances to justify their warrantless intrusions."), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985).

7. We concur with the Fifth Circuit that, without more, "in the ordinary case the risk that a criminal suspect will become aware of covert surveillance is ... insignificant in contrast to the more substantial benefits we all derive from the procedural safeguards of judicial process." *United States v. Munoz-Guerra,* 788 F.2d 295, 299 (5th Cir.1986).

Inevitably, then, the idea is moot. It has long been the practice in this circuit that an issue not presented in the district court will not be addressed for the first time on appeal. *See, e.g., United States v. Figueroa,* 818 F.2d at 1025; *United States v. Argentine,* 814 F.2d 783, 791 (1st Cir.1987). The prosecution has given us no reason to depart from this consuetudinal usage.

### B.

The government's next asseveration is that the FBI acted in good faith in failing seasonably to secure a search warrant. On that basis, appellant tells us that the good-faith exception to the exclusionary rule, articulated by the Court in *United States v. Leon,* 468 U.S. 897, 905–25, 104 S.Ct. 3405, 3411–22, 82 L.Ed.2d 677 (1984), commands our deference and counsels that the challenged evidence not be inhumed. This assertion is severely flawed.

■ First, *Leon* requires not merely good faith, but objective good faith. *See id.* at 924, 104 S.Ct. at 3421 ("the good-faith exception ... turn[s] ... on objective reasonableness"); *id.* at 922–23 & n. 23, 104 S.Ct. at 3420–21 & n. 23 (similar); *see also United States v. Diaz,* 841 F.2d 1, 5 (1st Cir.1988) (reviewing tribunal "must determine whether the agents were acting in objective good faith" before applying exclusionary rule). Though we do not question the subjective good faith of the agents involved in this perilous manhunt, that is not enough. The record will not sustain a finding that, under the circumstances of this foray, an objectively reasonable law enforcement officer would have believed a warrant was unnecessary. Because the agents knew in advance that they would be searching a home, not Williams's, and had more than ample time to visit or call a magistrate to obtain a search warrant, they should have done so.

■ Second, this court has not recognized a good-faith exception in respect to warrantless searches. In what seems a contrary vein, we have held that "the good faith exception ... will not be applied unless the officers executing search warrants, at the very minimum, act within the scope of the warrants and abide by their terms." *United States v. Fuccillo,* 808 F.2d 173, 177 (1st Cir.), *cert. denied,* 482 U.S. 905, 107 S.Ct. 2481, 96 L.Ed.2d 374 (1987); *cf. Maryland v. Garrison,* 480 U.S. 79, 88, 107 S.Ct. 1013, 1019, 94 L.Ed.2d 72 (1987) (validity of search of premises imprecisely described in warrant "depends on whether the officers' failure to realize the overbreadth of the [search] warrant [which they had obtained] was objectively understandable and reasonable").

It makes eminently good sense, we suggest, to employ the rule precisely as it has been formulated by the Court: as "a good-faith exception to searches conducted pursuant to warrants." *Leon,* 468 U.S. at 924, 104 S.Ct. at 3421. This is particularly so when one considers the Court's concern that "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Id.* at 921, 104 S.Ct. at 3419. To be sure, the Court has lately enlarged the casement of the good-faith window to encompass "evidence obtained by an officer acting in objectively reasonable reliance on a statute," *Illinois v. Krull,* 480 U.S. 340, 349, 107 S.Ct. 1160, 1167, 94 L.Ed.2d 364 (1987), but that is because it serves no purpose to penalize the officer for the legislature's error. *Id.* at 349–50, 107 S.Ct. at 1167.

In this instance, law enforcement personnel refrained from seeking a search warrant; they do not claim to have conducted a statutorily authorized administrative search. The error was attributable solely to the agents—not to some errant judicial officer or imprecise parliament. The differences between the present scenario and cases like *Leon* and *Krull* are like night and day. Based on the caselaw as it stands, the good-faith exception is not available to appellant.[8] *See United States*

8. The government's reliance upon *United States v. Vest,* 842 F.2d 1319 (1st Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 489, 102 L.Ed.2d 526 (1988), is mislaid. In that case, we refused to dismiss an indictment although certain evidence had been presented to the grand jury in violation of

*v. Winsor,* 846 F.2d 1569, 1579 (9th Cir. 1988) (en banc) (good-faith exception to exclusionary rule applies "only to searches conducted in good faith reliance on a warrant or a statute later declared to be unconstitutional"); *United States v. Morgan,* 743 F.2d 1158, 1165 (6th Cir.1984) (*Leon* not pertinent where officers had no warrant), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985); *see generally* 1 W. LaFave, *Search and Seizure* § 1.3(g) at 78 (2d ed.1987).

## C.

■ The government's final thrust is that the illegally-obtained information was, in any event, mere surplusage. Put another way, appellant contends that the affidavit upon which the belatedly-obtained search warrant was predicated, stripped of the impermissible references to tainted evidence, established probable cause within its four corners. For this reason, the prosecution asserts that the suppression order should not have extended to the fruits of the full-scale search of the premises. The thrust, we believe, is easily parried.

The applicable standard is not much in doubt:

It is enough if the affidavit upon which a [search] warrant is founded demonstrates in some trustworthy fashion the likelihood that an offense has been committed and that there is sound reason to believe that a particular search will turn up evidence of it.

*United States v. Aguirre,* 839 F.2d 854, 857–58 (1st Cir.1988).

In this case, the district court determined that the remains of the proffered affidavit, after excision of the tainted data, did not withstand constitutional scrutiny:

...[T]he fruits of the full-scale search of the home at West 22nd Street that followed are suppressed as to Barbara Curzi–Laaman.... The problem with this latter search is that the government's affidavit, shorn of the unlawfully obtained information, fails to establish a sufficient nexus between the items to be seized and the place to be searched. The FBI knew that Williams had spent the night there. They had no evidence, however, that he lived there. In fact, what evidence they had on the point was to the contrary.

D.Ct.Op. at 1001. We review this finding for clear error. *United States v. Aguirre,* 839 F.2d at 857; *United States v. Figueroa,* 818 F.2d at 1024. We see none here.

The search warrant for the house at 4248 W. 22d St. was issued on the affidavit of Leonard C. Cross, an FBI agent. Cross's affidavit (R.A. 19–48), subscribed on November 5, 1984, was a massive affair, comprising 30 pages of text and 58 separate numbered paragraphs (many quite detailed). The proposed search of Curzi's home was but a small part of the impetus behind the sworn statement; Cross's affidavit was a master document on the basis of which applications for leave to search a variety of "houses, garages and automobiles," R.A. 48, were tendered. We have examined the affidavit with meticulous care and find that, once the tainted material was blocked out, precious little remained anent the Curzi homestead. So configured, Cross's affidavit tells a magistrate no more about 4248 W. 22d St. than that Williams drove there from Deerfield, that he was apprehended there the next morning and, inferentially, that he spent the night. There is nothing in the leavings to indicate

Title III of the Omnibus Crime Control & Safe Streets Act, 18 U.S.C. §§ 2510–2520 (1982 & Supp. III 1985). But we were not dealing there with the Constitution, and our decision not to levy the sanction of dismissal for a violation of 28 U.S.C. § 2515 in no way presaged an extension of the *Leon* principle to warrantless conduct such as transpired in this case. As we noted in an earlier rendition of *Vest,* in refusing to apply a good-faith exception to allow the same illegally-obtained evidence to be used at trial, "the fourth amendment exclusionary rule is a judicially-fashioned rule serving different purposes than the congressionally-created rule of section 2515." *United States v. Vest,* 813 F.2d 477, 481 (1st Cir.1987).

that the building was Williams's home, or the residence of any other gang member, or a safehouse of some sort. There is nothing to indicate that other gang members were there. There is nothing to indicate that Williams had visited the place on other occasions, stored any of his belongings, or exercised any dominion over the property.

In the last analysis, the prosecution's argument on the point reduces to Williams's mere presence. That is manifestly inadequate to carry the day. A suspect's presence at a dwelling not reasonably thought to be his abode or the abode of a criminal confederate, without more, is too tenuous a connection to establish a meaningful relationship between the suspect and the contents of the house. *See, e.g., United States v. Hatcher*, 473 F.2d 321, 323 (6th Cir.1973); *United States v. Bailey*, 458 F.2d 408, 411–12 (9th Cir.1972); *cf. United States v. Picariello*, 568 F.2d 222, 227 (1st Cir.1978) ("not unreasonable to expect that [suspect's] apartment might contain" evidence of his criminality). The remnants of the affidavit, together with whatever nonspeculative inferences might plausibly be drawn therefrom, are too meagre to warrant reasonably prudent persons believing that the articles sought—explosives, weapons, etc.—were likely located at the situs. No matter how artfully the prosecution endeavors to cut and paste, there is not enough left to fit the bill. The district court did not err in ruling that Cross's affidavit, shorn of the improperly-obtained information, was insufficient to document the required nexus between the place to be searched and the articles to be seized. The totality of the known circumstances permitted no other conclusion.

## V. CONCLUSION

In this case, the government, despite the luxury of time, elected not to seek a search warrant. The course of official conduct which ensued worked a substantial violation of appellee's fourth amendment rights. The situation was not salvaged by the agents' putative good faith; by any exigency inherent in the circumstances; or by the search warrant which was belatedly procured. On this record, there is no principled way to permit the prosecution to use the contested evidence against Curzi.

We need go no further. Notwithstanding the seriousness of the offenses with which Curzi stands charged or the sociopathic exploits attributed to the gang, the Constitution remains the law of the land. As the Court observed in *Steagald:*

> The additional burden imposed on the police by a warrant requirement is minimal. In contrast, the right protected— that of presumptively innocent people to be secure in their homes from unjustified, forcible intrusions by the Government—is weighty.

451 U.S. at 222, 101 S.Ct. at 1653. The district court's suppression order must stand.

AFFIRMED.