**UNITED STATES of America, Plaintiff,**

v.

**Pablo Gonzalez ARIAS, Angel
D. Belasquez, Defendants.**

**Criminal Action No. 3:97–00094.**

United States District Court,
S.D. West Virginia,
Huntington Division.

Sept. 26, 1997.

Miller Bushong, Asst. U.S. Atty., Charles Miller, First Asst. U.S. Atty., Charleston, WV, for United States.

James Spurlock, Huntington, WV, for Defendant Arias.

Edward Weis, Asst. Federal Public Defender, Charleston, WV, for Defendant Belasquez.

## MEMORANDUM OPINION AND ORDER

GOODWIN, District Judge.

Pending before the Court is the defendants' motion to suppress evidence seized during a warrantless search of a hotel room on June 22, 1997. Although the United States argues that exigent circumstances justified the police officers' warrantless search, the grand jury testimony of three govern-ment witnesses plainly discredits this argument and demonstrates that the police officers carefully developed a plan to raid the defendants' hotel room without first seeking the warrant required by the Fourth Amendment of the United States Constitution.

The most disturbing element of the United States' case, however, is the utter inconsistency between government witnesses' grand jury testimony and the testimony of those same witnesses at the suppression hearing. In particular, Lieutenant Wallace Wendell Adkins and Paul Michael Moore offered versions of the warrantless entry that directly contradicted their testimony before the grand jury. Yet the government does not seem to be troubled by the fact that its witnesses took an oath and then provided plainly inconsistent testimony. To the contrary, in its September 19, 1997 brief, the United States adopts the witnesses' second sworn version of events and fails even to mention their contradictory grand jury testimony.

After carefully reviewing the facts of this case as set forth by in-court testimony and briefs in support of the parties' positions, the Court **FINDS** that government agents violated the Fourth Amendment when they entered the defendants' hotel room and seized evidence without a warrant. Additionally, the Court **FINDS** that exigent circumstances did not exist to excuse the absence of a warrant. Accordingly, the Court **GRANTS** the defendants' motion to suppress all evidence recovered during the course of this illegal entry and seizure, as set forth in the Barboursville, West Virginia, Police Department Property Record, attached as Exhibit II to Defendant Belasquez's Motion to Suppress Evidence.

### Factual Background

The United States indicted defendants Pablo Arias and Angel Belasquez on multiple counts of distribution of cocaine and conspiracy to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The government based its charges on a June 22, 1997 undercover drug "buy" staged by the Huntington, West Virginia, Violent Crime/ Drug Task Force. The staged buy occurred

at a Barboursville, West Virginia, Red Roof Inn and culminated in a warrantless entry and seizure by government agents. Both defendants moved to suppress evidence seized during the incident.

The Huntington Violent Crime/Drug Task Force began planning an undercover drug buy on June 17, 1997, when Huntington police arrested Paul Michael Moore for drunk driving. Because Moore's criminal record included drug offense convictions, Moore was referred to Lieutenant Wallace Wendell Adkins, a Task Force member, to determine whether Moore could provide the Huntington police with information about drug sales in the area. Hoping for leniency on the pending drunk driving charges, as well as outstanding charges in Florida, Moore agreed to cooperate with the Huntington police and to act as a confidential informant.

At their first meeting, Moore told Adkins that within the next few days, Pablo Arias and Angel Belasquez would drive from Miami, Florida, in order to sell cocaine in Huntington, West Virginia. Adkins requested that Moore contact him when Arias and Belasquez left Miami. Late on the night of June 21, 1997, Moore alerted Adkins to the defendants' departure from Miami.

Adkins knew that the defendants would arrive in Huntington within the next day and, therefore, began preparing for an undercover operation. First, he instructed Moore to arrange a cocaine purchase from the defendants after their arrival in Huntington. He then assembled a team of six uniformed police officers and several more undercover officers, including an FBI agent.

Arias and Belasquez arrived in Huntington at approximately 3:00 p.m. on June 22, 1997. Adkins and Moore devised a plan to buy time by having Moore's wife answer the phone when Arias was expected to call. When Arias did call for Moore, shortly after 3:00 p.m., Moore's wife told him that Moore was in Charleston visiting a sick relative and that he would not return for an hour. In fact, Moore was standing by, and as soon as Arias got off the phone, Moore traveled to the Huntington police station and notified Adkins of their arrival. At 5:32 p.m., Adkins tape-recorded a telephone call from Moore to Arias. During this telephone conversation, Moore arranged to buy six ounces of cocaine from Arias at the Barboursville, West Virginia, Red Roof Inn, where Arias and Belasquez were staying. After Moore arranged the cocaine buy, the police team wired Moore in order to monitor and record the drug transaction.

At approximately 7:30 p.m., Adkins drove by the Red Roof Inn to confirm the information provided by Moore. There, Adkins observed a Lincoln Continental with Florida license plates that fit Moore's description of the defendants' car. Adkins also observed a Hispanic man, who fit Moore's description of the defendants, taking a package out to the Lincoln Continental.

Despite the receipt of information confirming the defendants' drug activities and the planning involved in staging the drug buy and in organizing the police team, at no time during this lengthy preparation did Adkins or any other police team member initiate the ordinary processes to apply for a warrant. Yet the evidence clearly demonstrates that the police officers intended to enter Arias and Belasquez's hotel room. For example, Adkins provided Moore with certain code words that could be heard on the wire. Some code words clearly were designed to alert police to true emergencies, regardless of whether they planned to enter the room. For instance, Moore was to say "help" if he encountered a dangerous situation and to say "gun" if he saw a gun. Some codes, however, had no other purpose but to facilitate a police entry. For example, Adkins instructed Moore to count the "buy" money aloud and at a slow pace in order to signal to the officers that it was almost time to enter the hotel room. *See* Supp. Hr'g Tr. at 49. However, when defense counsel asked during the suppression hearing, "Wasn't a function of that counting the money to give the police, your group, time to prepare to go into the motel room?" Adkins forthrightly responded, "No, sir." Supp. Hr'g Tr. at 48. Adkins then was directly impeached by his earlier grand jury testimony, in which he admitted that the purpose of counting the money aloud was "to give us time to prepare to go in." Supp. Hr'g Tr. at 49.

Adkins also instructed Moore to say "Mc-Donald's" immediately before Moore opened the door to leave the hotel room. During the suppression hearing, Adkins offered the vague explanation that "McDonald's" was a signal to the police that the operation was in its "final stages." Supp. Hr'g Tr. at 21. When asked, "And the word McDonald's was also to let [the police] know that you were coming out to open the door for them; isn't that correct?" Moore responded "No." Supp. Hr'g Tr. at 87. Once again, both Adkins' and Moore's suppression hearing statements were directly contradicted by grand jury testimony in which Moore admitted that, "[T]he key word to let the police know that I was coming out to open the door *for them* was 'McDonald's.'" Supp. Hr'g Tr. at 88 (emphasis added). This grand jury testimony plainly demonstrates that the police officers planned for Moore to open the hotel room door, and once the door opened, the police officers intended to enter Arias and Belasquez's hotel room. At the suppression hearing, both Adkins and Moore testified in an evasive manner and failed to provide straightforward answers to simple questions about the undercover operation. Therefore, the Court is convinced that Adkins' and Moore's grand jury testimony is more credible than their testimony before this Court.

In addition to the grand jury testimony, the officers' intent to make a warrantless entry is further evidenced by the fact that Adkins conspicuously assembled a sizable police team right outside the defendants' room. Adkins lined six uniformed officers up against the wall immediately next to the door of the defendants' room. Undercover officers, including Adkins, were positioned in various locations near the hotel room. According to Adkins, the six uniformed officers were present for Moore's safety. Adkins also asserted that the police officers wore uniforms so that Arias and Belasquez could clearly identify them as police officers. In fact, Sergeant D'Alessio, ordinarily a plain-clothes detective, was instructed to wear a uniform for this particular assignment. D'Alessio explained at the suppression hearing, "I fully intended on people to see me, that's why I was there in uniform." Supp. Hr'g Tr. at 114. Ordinary logic suggests that the officers could not have intended that the defendants see them if they did not also intend to enter the defendants' room.

Finally, at approximately 9:00 p.m. on June 22, 1997, Moore entered the defendants' hotel room and proceeded with the drug buy. Moore purchased one ounce of cocaine and explained that he would return for the remaining five ounces at 11:00 p.m. if the buyer approved of the first ounce. Moore also engaged in conversation with Arias and Belasquez and offered to introduce them to the buyer later that evening to arrange future transactions. There is nothing in the tape-recording played at the suppression hearing to suggest that Moore was in any danger during the transaction or that the purchase proceeded other than as planned. Although Moore claimed to be nervous because he knew Arias carried a gun, Moore never saw a gun nor did Moore say "gun" or "help" during the buy. The tape-recording does not indicate any signs of nervousness on Moore's part (i.e., Moore's voice does not tremble nor is there any sign of apprehension in his voice). There was, therefore, no threat to Moore's safety, an exigent circumstance that would have otherwise justified police entry into the hotel room.

As instructed, Moore slowly counted the money aloud and accepted the bag of cocaine. Apparently, Moore left the cocaine on a table by the hotel room door just as he was leaving because he wanted to "get ready to get out of there." Supp. Hr'g Tr. at 83. As instructed, Moore also repeated the code word "McDonald's" three times as he approached the hotel room door. The tape-recording reveals that, within a split second of the third time Moore said "McDonald's" and the sound of the door unlatching, the police team stormed into the room.

Even though the tape-recording reveals officers running into the room the second the door latch turned, at the suppression hearing, Sergeant D'Alessio offered another, somewhat implausible account of the entry. According to D'Alessio's testimony, when the door opened D'Alessio stood immediately outside the doorway, giving him a clear view into the room. D'Alessio admitted that he

positioned himself directly in front of the hotel room door so that the defendants would see the police when the door opened. *See* Supp. Hr'g Tr. at 122–23 ("I was told when the door opened to make my presence known.") (testimony of Sergeant D'Alessio). Because D'Alessio positioned himself so prominently, Arias saw him when the door opened. D'Alessio claimed that there was a moment's pause as the two men stared at each other and that Arias then grabbed the cocaine and ran toward the bathroom. According to D'Alessio, this action prompted him to rush into the hotel room to prevent Arias from destroying evidence.

Although D'Alessio's account implies that Arias's flight towards the bathroom was an unforeseen exigency that forced the police to rush into the hotel room, there is further evidence suggesting that the police team planned to enter the room regardless of the events that transpired. Early in the suppression hearing, Adkins referred to the operation as a "raid," Supp. Hr'g Tr. at 12, implying that the police team intended to storm the hotel room after Moore's drug buy. Moore also testified that he overheard police officers stating that "[Moore] was going to do the buy and then they were going to shut the room down." Supp. Hr'g Tr. at 81. In fact, the tape reveals the police officers' entry into the room the very second that the hotel room door became unlatched.

Once inside the hotel room, police officers seized approximately nine items of evidence in plain view. This evidence included five ounces of cocaine police recovered from the toilet and the one-ounce bag Moore left on the table by the door. The police team then asked for consent to search the hotel room for more evidence. Arias withheld consent because the room was in Belasquez's name, and Belasquez could not speak English. It was not until after field tests confirmed that the seized substance was cocaine that the police officers finally applied for a search warrant to search the hotel room. The magistrate promptly executed the search warrant at approximately 11:15 p.m. on June 22, 1997.

## Analysis

The Fourth Amendment to the United States Constitution provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST., amend. IV. At the heart of Fourth Amendment jurisprudence lies the principle that, even when probable cause exists, "searches and seizures inside a man's house without a warrant are per se unreasonable in the absence of some one of a number of well-defined 'exigent circumstances.'" *Coolidge v. New Hampshire,* 403 U.S. 443, 477–78, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Although the Fourth Amendment prohibits illegal searches and seizures in public places, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).

The warrant requirement applies equally to searches and seizures conducted in lawfully acquired hotel rooms. *Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); *United States v. Kitchens,* 114 F.3d 29, 31 (4th Cir.1997); *United States v. McCraw,* 920 F.2d 224, 228 (4th Cir.1990). In this case, the Barboursville Red Roof Inn's records confirm that Angel Belasquez lawfully checked into a room for two adults shortly after 3:00 p.m. on June 22, 1997. Accordingly, the Fourth Amendment afforded Arias and Belasquez a reasonable expectation of privacy at the time of the warrantless police entry.

The Fourth Circuit has explained that "[t]he warrant requirement for an arrest in the home is imposed to protect the home, and anything incriminating law enforcement officers gain as a result of an illegal arrest taking place in the home should be excluded to deter such conduct." *United States v. McCraw,* 920 F.2d at 230. In the absence of an exception to the Fourth Amendment warrant requirement, courts must exclude from

evidence the fruits of an illegal search or seizure.

### Exigent Circumstances

▮ Although there are multiple exceptions to the warrant requirement for public searches and seizures, the only exception that applies to searches and seizures within the home is "exigent circumstances." *See, e.g., Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *McCraw,* 920 F.2d at 228. When police officers enter a home without a warrant, the government must prove that exigent circumstances justified the warrantless entry. *See McDonald v. United States,* 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948) (to establish the existence of exigent circumstances, the government must prove that warrantless entry was "imperative"); *see also United States v. Rico,* 51 F.3d 495, 500–01 (5th Cir.1995), *cert. denied,* 516 U.S. 883, 116 S.Ct. 220, 133 L.Ed.2d 150 (1995). Exigent circumstances include situations in which there is "imminent danger that evidence would be destroyed unless the officers immediately entered the house and took possession of it." *United States v. Taylor,* 90 F.3d 903, 909–10 (4th Cir.1996); *see also United States v. Turner,* 650 F.2d 526, 528–29 (4th Cir.1981) (exigent circumstances justified warrantless search when officers reasonably believed that evidence would be destroyed before a search warrant could be obtained). Whether exigent circumstances exist is an objective inquiry, focusing on the officer's reasonable belief. *United States v. Grissett,* 925 F.2d 776, 778 (4th Cir.), *cert. denied,* 500 U.S. 945, 111 S.Ct. 2245, 114 L.Ed.2d 486 (1991).

▮ In this case, the government argues that Arias's rush to the hotel room's bathroom to flush the cocaine constituted an exigent circumstance that justified a warrantless entry. The government relies heavily on *United States v. Grissett,* in which the Fourth Circuit upheld a warrantless entry and seizure of drugs from the defendant's motel room. 925 F.2d at 778. However, the facts in *Grissett* are easily distinguishable from the facts in this case. In *Grissett,* police responded to a call informing them that there was an armed man in a motel lobby. Police arrived on the scene, located the man, and recovered the gun. The man could not produce identification, but he told the police officers that a friend in a motel room could identify him. Uniformed police officers knocked on the motel room door for the purpose of establishing the armed man's identity. Although they did not suspect the presence of drugs, the officers smelled marijuana while talking to the man at the motel room door. Fearing that the defendants would dispose of the drugs before the officers could return with a warrant, the police entered and seized drugs that were in plain view. The Fourth Circuit determined that the entry was justified because the officers reasonably concluded that evidence would likely be destroyed before a warrant could be obtained, thereby giving rise to exigent circumstances. *Id.*

By contrast, the police team in this case knew that Arias and Belasquez had drugs in their hotel room. The police suspected as much for days, and they had even confirmed the presence of drugs when Moore called Arias at 5:32 p.m. on June 22, 1997. Unlike the *Grissett* police officers, who had little time to react to an unexpected discovery, the police team in the instant case had sufficient time to apply for a search warrant before their entry at approximately 9:00 p.m. Although it might have been reasonable for Sergeant D'Alessio to assume that Arias planned to destroy evidence when he rushed to the bathroom, the police officers easily could have foreseen such an exigency when they planned the undercover operation. In rejecting a similar claim of exigent circumstances, the Fourth Circuit noted, "The government will not be allowed to plead its own lack of preparation to create an exigency justifying warrantless entry." *United States v. Collazo,* 732 F.2d 1200, 1204 (4th Cir.1984), *cert. denied,* 469 U.S. 1105, 105 S.Ct. 777, 83 L.Ed.2d 773 (1985).

### Manufactured Exigencies

In this case, however, the Court is confronted with more than the police officers' mere lack of preparation. The police team's actions suggest that the officers manufactured an emergency situation to either allow them to enter the defendants' hotel room without a warrant or to justify a police raid

in which a warrant was never contemplated. Even though they had ample time to secure a warrant, the officers created an emergency situation when they deliberately made their presence known to the defendants. The United States now argues that this emergency situation justified a warrantless entry into the hotel room.

 Courts of Appeals other than the Fourth Circuit have dealt extensively with such manufactured exigencies. In *United States v. Rico*, the Fifth Circuit explained that, "Just as exigent circumstances are an exception to the warrant requirement, a police manufactured exigency is an exception to an exception." 51 F.3d 495, 502 (5th Cir.), *cert. denied*, 516 U.S. 883, 116 S.Ct. 220, 133 L.Ed.2d 150 (1995). Thus, police officers may not create the emergency situation and then rely on that emergency to justify a warrantless entry. *Id.* Although exigencies deliberately manufactured by police officers are plainly unconstitutional, even exigencies "manufactured guilelessly" may violate the Fourth Amendment. *Id.* The proper inquiry focuses not only on evidence of bad faith, but also on the "reasonableness and propriety of the agents' investigative tactics." *Id.* (citation omitted). In *Rico*, the Fifth Circuit evaluated the agents' decision to abandon covert surveillance and to make their presence known to the defendants. *Id.* After determining that the agents had insufficient time to obtain a search warrant, thereby rendering the agents' decision to drop covert surveillance and move in reasonable, the Fifth Circuit upheld the warrantless entry. *Id.* at 503.

In *United States v. Duchi*, the Eighth Circuit ruled that exigent circumstances could not justify a warrantless search when police created the exigency through their investigative strategies. 906 F.2d 1278, 1285 (8th Cir.1990), *cert. denied*, 516 U.S. 852, 116 S.Ct. 151, 133 L.Ed.2d 95 (1995). During the undercover operation in *Duchi*, police officers substituted a book for one of two bricks of cocaine in a package picked up by the defendant. Fearing that the defendant would be tipped off to police surveillance after discovering the book, officers entered the defendant's home without a warrant and placed him under arrest. In declining to find exigent circumstances, the Eighth Circuit focused on the "reasonably foreseeable consequences" of the officers' decision to substitute a book for the cocaine. *Id.* The court concluded that, "Since that danger was created by the officers' investigative strategy, it cannot justify their warrantless entry." *Id.*

In *United States v. Curzi*, the First Circuit found a Fourth Amendment violation when police officers created exigent circumstances by making their presence known to the defendants. *See United States v. Curzi*, 867 F.2d 36, 43 (1st Cir.1989). In *Curzi*, the court of appeals determined that the officers' decision to drop covert surveillance was unreasonable because there was no evidence to suggest that the defendants would have otherwise become aware of the police presence. *Id.* That is, the officers' decision to discontinue covert surveillance was the product of their own timetable; it was not prompted by activity within the dwelling under surveillance. *Id.* The First Circuit reasoned that because no evidence existed "to indicate that Williams or any other occupant of the dwelling had discovered the surveillance," no exigent circumstances existed to justify the agents' initial decision to reveal their presence. *Id.* Thus, the court characterized the agents' failure to resort to a magistrate prior to ordering the occupants to exit as "inexcusable." *Id.* As the court of appeals explained, the proper inquiry is "whether exigent circumstances justified the agents' initial decision to reveal their presence." *Id.*

In *United States v. Munoz–Guerra*, police officers responded to an anonymous tip that the defendants were storing large quantities of marijuana in their condominium. 788 F.2d 295, 296–97 (5th Cir.1986). After confirming the informant's story, the police officers decided to knock at the patio door of the condominium instead of maintaining covert surveillance from several ready positions on the premises. When the defendant inside went to get a key, the officers broke in and arrested him, ostensibly to prevent the destruction of evidence. The Fifth Circuit ruled that the police officers' warrantless entry violated the Fourth Amendment because "without reason to believe that a criminal suspect was aware

of police surveillance, the mere presence of firearms or destructible, incriminating evidence does not create exigent circumstances." *Id.* at 298. The key factor in reaching this conclusion was that the police could have easily surveyed the condominium covertly, giving them time to obtain a warrant with little risk that the defendants would flee or destroy evidence. *Id.* Instead, warrantless entry became "a foregone conclusion the instant the agents revealed themselves to Munoz–Guerra at the patio door." *Id.* Because there were no exigent circumstances to justify the officers' *initial decision* to approach the patio door, the court of appeals held the subsequent warrantless entry unconstitutional.

The government relies on *Grissett* to argue that the police team in the instant case did not create the exigent circumstances. *Grissett* is plainly distinguishable because the *Grissett* police did not proceed to the motel room with the intention of making a drug bust. Rather, the officers sought verification of an arrestee's identity. The presence of drugs only became known to the police officers in *Grissett* after the defendant opened the motel room door. 925 F.2d at 778. Therefore, it cannot be argued that the *Grissett* police officers created the exigent circumstances that precipitated their warrantless entry.

■ In this case, however, the police team was fully aware that the defendants had drugs in the hotel room. Moreover, Adkins or any other officer easily could have foreseen that allowing the defendants to see uniformed officers in the hotel room doorway would create a situation wherein the defendants would attempt to dispose of the cocaine.

The government argues that Adkins' decision to go ahead with the undercover operation was reasonable because he was trying to "sure up probable cause by seeking a buy." Gov't Mem. at 5. This argument misses the point. In determining whether Adkins acted reasonably, this Court must examine the decision to place uniformed officers in the defendants' line of sight, not the decision to conduct an undercover buy. The decision to place the officers so prominently sparked an easily foreseeable reaction: Arias's attempt to flush the cocaine, the exigent circumstance that the United States now argues excuses the absence of a warrant.

Clearly, any exigent circumstances in this case were of the officers' own making. As in *Curzi*, there is no indication that the defendants were tipped off to the police presence, and thus, there was no reason to drop covert surveillance. After Moore bought the cocaine, the police team easily could have requested a warrant allowing them lawful entry. As in *Munoz–Guerra*, the police team could have observed the defendants undetected from several points around the hotel, thereby ensuring that the defendants did not leave the premises. Furthermore, the facts known to the police team indicated that the defendants did not plan to leave the hotel or to dispose of the cocaine; in fact, the defendants agreed to sell to Moore a large quantity of cocaine later that night. It is readily apparent that the police team had sufficient probable cause to obtain a warrant after Moore completed the recorded drug buy, if not earlier, and that the officers could have allowed Moore to leave, monitored the defendants' room covertly, and applied for a warrant. Instead, the police team stormed the hotel room in blatant violation of the Fourth Amendment.

And this leads to the most disturbing aspect of the case. Even if the Court is willing to believe the government's argument that the police officers did not plan to manufacture an exigency allowing a warrantless entry, the only other plausible explanation is that the police failed to contemplate the Fourth Amendment warrant requirement entirely, and now offer a concocted version of events in which exigent circumstance forced the police team to enter. This Court is inclined to believe the latter explanation. From the facts adduced at the suppression hearing, it appears that Adkins and his police team planned a well-staged raid without ever contemplating the warrant requirement. That is, Adkins and his police team decided to conduct a drug raid, "shut the room down," and then *afterwards,* concoct a version of the story in which exigent circumstances forced them to enter. Beyond their

total circumvention of the warrant requirement, government witnesses proffered testimony before this Court that was blatantly inconsistent with earlier grand jury testimony. The government cannot profit from witnesses who shade the truth, just as it cannot base its prosecution on evidence seized in flagrant disregard of constitutional requirements.

## Whether Drugs Purchased Through Confidential Informant Are Government Property Not Subject to Suppression

Even if the Court suppresses the five ounces of cocaine that Arias attempted to destroy, the government argues that the single ounce purchased by Moore is not suppressible because it became government property when the defendants sold it to Moore. Cases cited by the United States in support of this proposition miss the mark. First, the government cites *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). In *Abel,* FBI agents seized items left in the trash after the defendant checked out of a hotel room. Although the agents did not have a warrant, the hotel manager consented to a search. The Court found that Fourth Amendment rights were not implicated because the defendant had abandoned his property, and the hotel had exclusive right to possession of the room and its contents. *Id.* 362 U.S. at 241. By contrast, the defendants in this case had not checked out at the time the police officers entered the hotel room. Furthermore, if anyone abandoned the one ounce of cocaine, it was the informant, Moore, when he left it sitting on the hotel room table.

The other case cited by the government, *United States v. King,* 55 F.3d 1193 (6th Cir.1995), is also distinguishable. In *King,* the defendant's wife provided the police with letters sent by the defendant. Because the defendant could not expect to have the letters returned to him, the Sixth Circuit found that the defendant had no reasonable expectation of privacy in the letters that would give rise to a Fourth Amendment right. *Id.* at 1195–96.

■ The crucial distinction between the cases cited by the United States and this case is that both Arias and Belasquez had a reasonable expectation of privacy in their hotel room. Unlike the defendant in *Abel,* Arias and Belasquez did not check out and surrender exclusive possession of the hotel room. And, in contrast with *King,* whether the defendants expected to retain possession of the one ounce of cocaine is immaterial because the police team's seizure of the one ounce occurred during an unlawful entry. In raising a Fourth Amendment challenge, defendants need only show a reasonable expectation of privacy in the place searched *or* the things seized. Even if the defendants relinquished possession of the one ounce of cocaine, the fact remains that Moore left the one ounce of cocaine in the hotel room prior to police entry. Because Arias and Belasquez had a reasonable expectation of privacy in their hotel room, all items seized pursuant to that unlawful entry, including the one ounce, are properly subject to suppression.

## Independent Source Doctrine

■ The government also relies on the independent source doctrine as an alternative grounds for admissibility. Under the independent source doctrine, unlawfully seized evidence may be admitted if it is acquired pursuant to a warrant based on information completely independent of the illegal police conduct. *Murray v. United States,* 487 U.S. 533, 542, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988); *United States v. Walton,* 56 F.3d 551, 553–54 (4th Cir.1995). However, the independent source doctrine does not apply if "the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during the entry was presented to the Magistrate and affected his decision to issue the warrant." *Murray,* 487 U.S. at 542.

■ In this case, the government has failed to establish that the warrant executed at 11:15 p.m. was based on information gathered from a source wholly independent of the prior illegal entry. In arguing the validity of the warrant, the United States relies on the single ounce of cocaine purchased by Moore. The government insists that the ounce of cocaine is government property, and they cite Moore as their "independent source."

As noted above, the Court rejects the government's contention that the one ounce was government property and that this status excused its illegal seizure. Further, there is nothing to indicate that the warrant was based exclusively on information provided by Moore. Rather, the most logical conclusion is that Adkins and the police team obtained a warrant at 11:15 p.m. by providing the magistrate with evidence acquired through an illegal entry, thereby rendering the independent source doctrine inapplicable.

### Inevitable Discovery Doctrine

 Finally, the government resorts to the inevitable discovery doctrine. Under this doctrine, unlawfully seized evidence may be admitted despite its illegality if officers would have inevitably discovered the evidence through lawful means. *Nix v. Williams,* 467 U.S. 431, 439–45, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). As the government concedes, this argument is unlikely to impress the Court. There is no evidence of another investigation that would have inevitably led to a lawful search of the defendants' hotel room. No police officers attempted to secure a warrant before or during the illegal entry and subsequent arrests. In this case, all the evidence establishes is one undercover operation, in which police officers prepared for numerous contingencies and, inexplicably, overlooked the requirement of a warrant. Accordingly, the inevitable discovery doctrine cannot save this evidence from suppression.

### Conclusion

Although courts have applied the exclusionary rule for over half a century, its application has often produced troubling results. Quoting Justice Cardozo, the *Mapp v. Ohio* Court acknowledged the criticism that "under our constitutional exclusionary doctrine '[t]he criminal is to go free because the constable has blundered.'" 367 U.S. 643, 659, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (citation omitted). The Supreme Court has forgiven many of these blunders by carving out Fourth Amendment exceptions, including exceptions for good faith, inevitable discovery, and exigent circumstances. As the "war on crime" has intensified, the Court has created many more exceptions such that the Fourth Amendment's protective scope has been greatly diminished. However, there is no existing Fourth Amendment exception to excuse the flagrant lawlessness of the police officers in this case. A reasonable person could conclude that it was not until the suppression hearing that the Fourth Amendment actually crossed the minds of these police officers. A reading of the suppression hearing transcript would convince even the most skeptical reader that the government witnesses shaded the truth to explain away obvious contradictions in testimony and to excuse their absolute disregard of the highest law of the land. Under these circumstances, the Court has no choice but to apply the exclusionary rule. In addressing criticisms provoked by this opinion, the Court refers readers to Justice Clark's response to the notion that criminals will be set free on account of the constable's blunders:

> In some cases, this will undoubtedly be the result. But ... "there is another consideration—the imperative of judicial integrity." The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence.

*Mapp v. Ohio,* 367 U.S. at 659 (citation omitted).

For this reason, and for all other reasons stated herein, the Court **GRANTS** the defendants' motion to suppress evidence seized during the June 22, 1997 entry. The Clerk is directed to mail a copy of this Order to the defendants, all counsel of record, and Judge Goodwin.