**UNITED STATES of America**

v.

**Rodney J. DAOUST, Defendant.**

**Crim. No. 88–00015–B.**

United States District Court,
D. Maine.

Dec. 11, 1989.

Richard S. Cohen, U.S. Atty., James McCarthy, Asst. U.S. Atty., Bangor, Me., for plaintiff.

Leonard Sharon, Lewiston, Me., for defendant.

## MEMORANDUM DECISION ON MOTION TO SUPPRESS

CONRAD K. CYR, District Judge.[*]

A three-count superseding indictment charges the defendant with making false representations to obtain a firearm and with receiving and possessing firearms following a felony conviction. The defendant moves to suppress evidence, and the fruits of evidence, seized in connection with a warranted search of his residence.

### I. FINDINGS OF FACT

As a known associate of Robert Whittemore, a suspected cocaine dealer, the name of Rodney Daoust first surfaced in mid-1987 in connection with a federal investigation into cocaine distribution in Maine. Senior Special Agent Kenneth MacMaster and Detective Michael Sperry, both of the Maine State Police [MSP], and Lt. Timothy Bourassa, of the Rumford Police Department, went to the Daoust residence on August 11, 1987, to interview Daoust in connection with the Whittemore investigation. The defendant's house is situated at the end of a driveway which turns off a dirt road approximately one mile from Route 2 in Carthage, Maine. The driveway ends near the left front (southwest) corner of defendant's house. Upon their arrival the officers observed no telephone or power lines leading to the house.[1] There were toys outside the house, but no vehicles in the driveway. Detective Sperry knocked several times on the double-glass *cellar* door near the southwest corner of the house. Receiving no response, the officers left.

On August 21, 1987, at about noon, Sperry returned to defendant's house with MSP Detective William Draper. The residence appeared just as it had on August 11, and again there was no vehicle in the driveway. The officers first knocked on the cellar

---

[*] Of the First Circuit, sitting by designation.

1. Defendant's ex-wife told Sperry that the defendant had no telephone. Earlier that summer Sperry had made at least one unsuccessful attempt to obtain a telephone listing in defendant's name.

door. Upon receiving no response and observing that the front door, which is located at the *mainfloor* level on the south side of the house, was approximately five or six feet above ground level, and inaccessible, the officers decided to walk around the house to look for an accessible mainfloor entrance.

Sperry and Draper proceeded from the southwest corner of the house, where the cellar door is located, along the west side. The ground along the west side of the house slopes steeply upward to such an extent that the cellar wall, which is completely exposed along the entire south wall of the house, is completely covered by earth along the rear (north) wall. There is no path around the house, nor is the perimeter of the house landscaped in any way. Upon determining that there was no door on the north side of the house, Sperry and Draper continued along the north wall to look for a door on the east side.

While walking along the north wall Sperry looked into a window near the northeast corner of the house to see if anyone was inside. The window ledge is approximately six feet above ground level, and Sperry and Draper, walking side by side, came within about three feet of the window as they were walking past it. Approaching and peering up through the window, Sperry saw a semi-automatic handgun fastened between the exposed kitchen ceiling joists which run parallel to the east side of the house. The view through the window was unobstructed by shades, curtains, shutters, vegetation or any other visual obstruction. Although there was a fly screen on the window, it did not obstruct Sperry's view into the house. From his vantage point, which required him to look up at an angle through the window, Sperry would have been able to see a person standing near the window, but all he in fact saw was the ceiling area of the kitchen. Sperry did not use any device, or otherwise attempt, to enhance his view. Sperry asked Draper to look through the window, and Draper immediately saw the handgun.

Sperry and Draper continued around the north side of the house looking for a mainfloor entrance, proceeding from the north side, along the east side and then back to the south side. The officers left the premises immediately upon learning that there was no accessible mainfloor entrance.

At about four or five o'clock that afternoon, Sperry returned to the Daoust residence, knocked on the cellar door, and left immediately after receiving no response.

Sperry returned to the residence on August 24, 1987, this time with Special Agent MacMaster. There were no vehicles in the driveway. After knocking on the cellar door to no avail, Sperry and MacMaster proceeded to the northeast corner of the house, where Sperry asked MacMaster to look through the window. Standing a few inches from the window, MacMaster saw the handgun between the ceiling joists. Sperry's stated intention in pointing out the location of the handgun was to forewarn MacMaster in the event MacMaster were to return to the residence without Sperry. Immediately afterward the officers left the premises.

En route to Augusta, Sperry and MacMaster decided to find out whether Daoust had ever been convicted of a felony. They confirmed that Daoust had been convicted of felony burglary, that he had not received an executive pardon and that he was over 18 years of age when he committed the felony offense. The officers learned also that the defendant had been convicted in 1982 of disorderly conduct and class D assault. Local law enforcement officials informed them that the defendant had been divorced and that he lived alone.

Sperry and MacMaster believed that the defendant was in violation of a Maine statute which criminalizes the possession of a firearm by a convicted felon. *See* Me.Rev. Stat.Ann. tit. 15, § 393. Accordingly, on August 24 MacMaster prepared an affidavit and procured a warrant to search the Daoust residence for "[a] semi-automatic handgun, blue steel in color," and nothing else.

Prior to executing the search warrant, MacMaster informed the state district attorney that Daoust was under investigation

for firearms violations. MacMaster contacted the United States Attorney's office as well. It is normal procedure for State of Maine law enforcement officers assigned to the federal-state anti-drug task force to contact the U.S. Attorney's office concerning suspected criminal activity which may be subject to prosecution by both state and federal authorities.

The search warrant was executed on August 25, 1987. Sperry, Bourassa, Draper and MSP Trooper Dennis Appleton participated in the search, with MacMaster in charge. All of the officers had prior experience in the execution of search warrants. Before going to the Daoust residence, the search party met near Jay, Maine to plan the search. At the meeting it was stated that there was no way of knowing whether the officers would find anyone at the residence, and that it would be necessary to conduct a routine safety sweep for concealed persons immediately upon entering the premises in order to assure that the premises were safe to work in. The safety sweep was considered necessary due to the presence of at least one firearm on the premises of a convicted felon with a criminal record for assaultive conduct. MacMaster gave the officers their duty assignments, assigning Draper and Bourassa responsibility for conducting a safety sweep of the second floor.

The officers arrived at the Daoust residence at 7:00 a.m. There were no vehicles in the driveway, and no lights were visible in the house. The officers wore raid jackets and hats bearing MSP insignia. After MacMaster knocked on the cellar door, and yelled "police," to no avail, the officers fanned out around the house. Sperry went to the rear of the house and looked through the northeast corner window to confirm that the handgun was still located between the ceiling joists. At about the same time, MSP Trooper Appleton observed the handgun through a kitchen window on the east side of the house.

The officers discussed the least destructive means of forcing entry. They decided to try a cellar window on the east side of the house. Draper found and held a board against the window frame, while Sperry placed his foot against the board to force the window inward. The force bent the latch securing the top of the window, but did not break either the latch or the window. Sperry crawled through the window and let the other officers in through the cellar door.

Immediately after entering the cellar, Bourassa and Draper proceeded to the second floor to conduct a safety sweep for concealed persons. Its purpose was to assure the safety of the officers, and any occupant, by locating concealed persons and conducting them to a central location on the premises while the officers were seizing the handgun and preparing an inventory. The officers considered a routine safety sweep necessary because they knew that there was at least one firearm in the house, and they could not be sure that the residence was unoccupied.

Immediately upon entering through the cellar door, Bourassa and Draper proceeded to the main floor and on to the second floor, which consists of a bedroom and an unfinished room. Draper was experienced in the securing of search premises, and he knew that he and Bourassa were to conduct a superficial sweep for any person who might be concealed on the second floor, and that he was to yell "secure" if they found no one. The superficial safety sweep was restricted to places where a person could have been concealed. The sweep was swiftly completed, within about 30 seconds. There was no search for evidence, and no occupants were found.

During the sweep of the second floor bedroom, Draper saw three long guns. Two of the guns—a 12–gauge Winchester pump shotgun and a Remington model 30–06 rifle (which was inside a rifle case)—were observed leaning against a dresser. Another gun—a single-shot, 12–gauge Revelation model 350 shotgun—was partially visible behind a nightstand to the right of the bed. Immediately upon observing them, and without moving any object (or removing the soft-covered gun case containing the 30–06), Draper recognized that each of the three objects was a gun. After

completing the safety sweep of the second floor, Bourassa and Draper returned to the main floor and told Appleton and MacMaster about the three guns.

The main floor consists of a large living-room area, a kitchen area in the southeast corner, and a dining area. The officers observed an unconcealed Thompson black powder musket leaning against a cabinet to the right of the kitchen sink, and an unconcealed ammunition clip on a counter to the right of the kitchen sink. Before any item was seized, including the handgun fastened between the ceiling joists, Appleton photographed the item in the position first observed.

Prior to leaving the premises, the officers left a copy of the search warrant, an inventory of the items seized and a note informing the defendant how to contact MacMaster. The officers replaced the cellar window by bending the latch back to its original position and locking it. They locked the cellar door on their way out.

In early October, Appleton received a phone call from the defendant, who asked to speak with MacMaster about the return of the firearms seized from his home. The defendant was particularly interested in two of the weapons, which he said did not belong to him.

The record reveals no other attempts to contact Daoust prior to August 1987, except through his estranged wife and Sperry's inquiry for a telephone listing. *See* note 1 *supra.* At no time was there any police surveillance of defendant's residence.

The United States Attorney for the District of Maine decided to prosecute the Daoust case in federal court after the firearms seized from the Daoust residence had been turned over to the Bureau of Alcohol, Tobacco and Firearms.

## II.  DISCUSSION

The defendant advances *four* principal contentions in support of suppression. *First,* he argues that the search warrant was predicated on evidence unconstitutionally discovered and seized; *second,* that the forcible entry of his home violated fourth amendment principles embodied in the "knock and announce" rule codified at 18 U.S.C. § 3109; *third,* that the search was flagrantly overbroad because the safety sweep of the second floor went beyond the scope of the warrant and was unjustified; and *fourth,* that the defendant's assertions of a possessory interest in the guns seized from his residence, as well as all records and other evidence (e.g. testimony of potential witnesses) discovered through defendant's statements following the search, are the tainted fruit of the illegal search and seizure. *See Wong Sun v. United States,* 371 U.S. 471, 484–87, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1963).

The government response relies mainly on the "plain view" doctrine, which requires "that the seizing officer have a prior justification for being in a position to see the item in plain view, that the discovery of the item be inadvertent, and that the evidentiary value of the item be 'immediately apparent' to the officer," *United States v. Johnston,* 784 F.2d 416, 419 (1st Cir.1986).[2] *See also Texas v. Brown,* 460 U.S. 730, 741–42, 103 S.Ct. 1535, 1542–43, 75 L.Ed.2d 502 (1983) (plurality opinion); *Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971) (plurality opinion); *Ker v. California,* 374 U.S. 23, 43, 83 S.Ct. 1623, 1635, 10 L.Ed.2d 726 (1963) (plurality opinion).

### 1.  *Validity of Search Warrant*

Daoust challenges the constitutionality of Sperry's initial warrantless observation of the handgun on August 21, 1987, the original source of the information included

---

**2.** The critical focus for present purposes is upon the first element: whether Draper had a "prior justification for being" in the upstairs bedroom when he observed the three long guns. There is no contention and no evidence that these guns were not discovered "inadvertently," or that their evidential value was not immediately apparent. *See also Texas v. Brown,* 460 U.S. 730, 741–42, 103 S.Ct. 1535, 1542–43, 75 L.Ed.2d 502 (1983) (seizure "presumptively reasonable" where there is probable cause to believe property is associated with criminal activity) (plurality opinion).

in the affidavit submitted by MacMaster in support of the application for the search warrant.[3] Shorn of any such taint the MacMaster affidavit does not show probable cause. *Cf. Franks v. Delaware,* 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978) (challenge to veracity of affidavit merits hearing if affidavit would not support probable cause absent challenged portions).

### a. Curtilage Intrustion

■ The defendant concedes that the officers had the right to come upon his land to locate and interview him in connection with the Whittemore investigation, *see, e.g., United States v. Miller,* 589 F.2d 1117, 1133 (1st Cir.1978), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979); *Davis v. United States,* 327 F.2d 301, 303 (9th Cir.1964), but he insists that the officers arrived at their vantage point near the window on the northeast corner of the house by means of an unconstitutional trespass upon the curtilage of his home.

"The private property immediately adjacent to a home is entitled to the same protection against unreasonable search and seizure as the home itself." *United States v. Anderson,* 552 F.2d 1296, 1300 (8th Cir. 1977); *United States v. Bradshaw,* 490 F.2d 1097, 1100 (4th Cir.), *cert. denied,* 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974). *Accord Oliver v. United States,* 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984). But " 'police with legitimate business may enter the areas of the curtilage which are impliedly open to use by the public,' and . . . in so doing they 'are free to keep their eyes open and use their other senses.' " 1 W. LaFave, *Search and Seizure* § 2.3(c), at 393 (2d ed.1987) (quoting *State v. Crea,* 305 Minn. 342, 233 N.W.2d 736 (1975)). *See also Anderson,* 552 F.2d at 1300. Thus, Sperry's *initial* intrusion upon the curtilage of the Daoust

home for the legitimate purpose of locating and interviewing the defendant was reasonable in the circumstances. *See id.* (initial intrusion justified by legitimate objective of locating defendant for questioning about theft).

### b. The Circumambulation

■ The defendant complains that the officers trammeled his fourth amendment rights by proceeding around the pathless and unlandscaped perimeter of his home in search of an accessible mainfloor entrance. Law enforcement agents confronted a somewhat similar situation in *Anderson.*

> The agents rang the doorbell and knocked, but no one appeared. A light was visible inside the house and the agents heard a dog barking behind it. After waiting briefly, they walked around the house to determine if there was someone with the barking dog. As they walked along the side of the house, they noticed a lighted basement window partially covered by a shade. Glancing through the window, they saw numerous unopened crates marked "Coronado Color Television" piled on the floor of the basement. After observing the cartons, the agents proceeded to the back porch where they saw the dog alone. They then returned to the front of the house.

552 F.2d at 1298. The Eighth Circuit decided that it could not conclude "that the agents' action in proceeding to the rear after receiving no answer at the front door was so incompatible with the scope of their original purpose that any evidence inadvertently seen by them must be excluded as the fruit of an illegal search." *Id.* at 1300 (footnote omitted). *See also United States v. Roberts,* 747 F.2d 537, 542–43 (9th Cir.1984) (police observations through unobstructed windows, incident to attempt to question occupant of premises, held lawful); *United States v. Gabriel,* 715 F.2d

**3.** Daoust does not contest the constitutionality of the observation which MacMaster made of the handgun at Sperry's invitation on August 24, 1987, nor has either party addressed the constitutionality of that incursion upon the curtilage of Daoust's home. In any event, MacMaster also included in his affidavit hearsay information concerning Sperry's observation of the handgun on August 21, 1987, which itself provides sufficient support for the MacMaster affidavit. *See Franks v. Delaware,* 438 U.S. 154, 165, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978) ("probable cause may be founded upon hearsay").

1447, 1450 (10th Cir.1983) (declining to suppress observations through windows of unfinished house by agents legitimately on premises to locate suspect associated with owner). *Cf. United States v. Wheeler,* 641 F.2d 1321, 1322–27 (9th Cir.1981) (no unreasonable search where officer, attempting to locate defendant for questioning, observed incriminating evidence by peering over fence surrounding defendant's backyard from vantage point atop a tire).

The legitimate original purpose of the officers was to locate Daoust for questioning in connection with the Whittemore cocaine investigation. Unable to determine whether there was anyone in the residence, or to gain access to the only mainfloor entrance visible from the front of the house, Sperry and Draper proceeded around the house looking for an accessible mainfloor entrance. The perimeter of the residence was not landscaped, and there was no discernible path to or around the back of the residence. The front (south side) of the house was unfinished, and it was not unreasonable for the officers to expect that the more elevated ground level along the rear (north side) of the house would afford mainfloor access. Upon discovering that there was no mainfloor entrance at the rear of the house, the officers were continuing to pursue their original purpose when Sperry made the initial observation of the handgun while looking through the unobstructed window to see if anyone was inside the house. Since the initial encroachment upon the curtilage was lawful and the handgun was observed in pursuit of the same purpose, no reasonable expectation of privacy was violated.

Therefore, the MacMaster affidavit was sufficient to establish probable cause, and the search warrant is valid.

---

**4.** Moreover, courts have excused incomplete compliance with "knock and announce" requirements where full compliance would amount to a futile gesture, as when officers know or reasonably believe that the premises are vacant. *See, e.g., Jackson,* 354 F.2d at 981–82 (court declines to find unreasonableness where officers knocked and "hollered ... police," waited *ten seconds* and, receiving no response, forced

## 2. *Lawfulness of Forcible Entry*

The defendant argues that the officers violated the "knock and announce" requirement of 18 U.S.C. § 3109, or the fourth amendment principles embodied in it, by forcibly entering the residence through a cellar window after knocking on the cellar door and shouting "police," but without announcing their specific purpose.

### a. *"Knock and Announce" Statute*

■ Section 3109 states:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

18 U.S.C. § 3109. The government correctly asserts that section 3109 does not control the present case since these state police officers were acting pursuant to a state court search warrant for evidence of a violation of state law. *See Miller v. United States,* 357 U.S. 301, 305, 78 S.Ct. 1190, 1193, 2 L.Ed.2d 1332 (1958) (lawfulness of forced entry by local officers to arrest occupant is controlled by local law). Maine law applies in these circumstances. *Cf. United States v. Bradley,* 455 F.2d 1181, 1185 n. 8 (1st Cir.1972) (state law governs arrest by state officials for federal offenses) (citing *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963)), *aff'd,* 410 U.S. 605, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973); *Jackson v. United States,* 354 F.2d 980, 981 (1st Cir.1965) (Massachusetts law applies where federal agents, *assisted* by Boston police, force entry to execute arrest warrant). Maine has neither a statutory, *see Maine v. Martelle,* 252 A.2d 316, 319–20 (Me.1969), nor a decisional "knock and announce" rule.[4]

---

entry to execute arrest warrant); *United States v. Brown,* 556 F.2d 304, 305 (5th Cir.1977) (officers knock and announce identity, but not purpose, and wait for over an hour before forcing entry to execute search warrant); *Payne v. United States,* 508 F.2d 1391, 1394 (5th Cir.) (futile to require officers to await refusal of admittance to unoccupied dwelling), *cert. denied,* 423 U.S. 933, 96 S.Ct. 287, 46 L.Ed.2d 263 (1975).

The forced entry by MSP officers violated neither section 3109, nor any Maine decisional or statutory rule.

### b. *Constitutional Implications of Failure to "Knock and Announce"*

An unannounced entry effected by state or local police in accordance with state law may nonetheless be unreasonable within the meaning of the fourth and fourteenth amendments. *See Ker v. California,* 374 U.S. 23, 28, 42, 83 S.Ct. 1623, 1627, 1634, 10 L.Ed.2d 726 (1963) (unannounced police entry, effected by means of passkey to prevent destruction of contraband, upheld as reasonable incident of lawful arrest without warrant). The *Ker* plurality accepted the view of the California Supreme Court that the warrantless arrest was lawful under the "exigent circumstances" exception to California's statutory "knock and announce" rule, *id.* at 38–41, 83 S.Ct. at 1632–34 (plurality opinion), but allowed as how, "notwithstanding its legality under state law, the method of entering [a] home may offend federal constitutional standards of reasonableness and therefore vitiate the legality of an accompanying search," *id.* at 38, 83 S.Ct. at 1632. Since Ker's conduct had been "furtive," *id.* at 40, 83 S.Ct. at 1633, and the police believed that Ker possessed narcotics "which could be quickly and easily destroyed," *id.,* the unannounced entry was considered reasonable within the meaning of the fourth amendment, *id.* at 40–41, 83 S.Ct. at 1633–1634.[5]

Although the plurality opinion in *Ker* plainly requires that an unannounced forcible entry be reasonable within the meaning of the fourth amendment, *Ker* refrained from imposing an inflexible fourth amendment "knock and announce" rule incorporating in all circumstances the particular procedures delineated in section 3109.[6] Several courts of appeals since *Ker* have discerned a "knock and announce" requirement in the Constitution, though often in *obiter dicta* and sometimes without close analysis of the plurality opinion in *Ker.*[7] *Cf. United States v. Francis,* 646 F.2d 251,

*Cf. United States v. Agrusa,* 541 F.2d 690, 697–98 (8th Cir.1976) ("[U]nannounced and forcible entries into vacant premises, even homes, in order to conduct a search, are constitutional in the *absence* of exigent circumstances, provided that the search and seizure is pursuant to warrant and reasonable under the circumstances.") (emphasis in original) (vacant *business* premises forcibly entered pursuant to court order to install electronic intercepts) (dictum), *cert. denied,* 429 U.S. 1045, 97 S.Ct. 751, 50 L.Ed.2d 759 (1977). *But cf. Miller,* 357 U.S. at 306–310, 78 S.Ct. at 1194–96 (failure to announce authority and purpose before forcing entry to effect warrantless arrest of occupant violated District of Columbia criteria assumed to be identical to § 3109). *See also infra* pt. II, 2, b & notes 5 & 6.

5. Mr. Justice Brennan, writing for four dissenting Justices, vigorously challenged the sufficiency of the evidence to support a finding of exigent circumstances. *Ker,* 374 at 60–63, 83 S.Ct. at 1643–1645 (dissenting opinion). The dissent expressed the view also that a fourth amendment "knock and announce" rule had been violated by the failure of the police to announce their presence and purpose before entering. *Id.* at 53, 83 S.Ct. at 1639 (dissenting opinion).

6. In *Sabbath v. United States,* 391 U.S. 585, 591 n. 8, 88 S.Ct. 1755, 1759 n. 8, 20 L.Ed.2d 828 (1968), the Court indicated that *Ker* indeed had not settled the constitutional question. "Exceptions to any *possible* constitutional rule relating to announcement and entry have been recognized [by the dissent in *Ker*]" (emphasis added).

This conclusion is supported by the dissent in *Payton v. New York,* 445 U.S. 573, 603–20, 100 S.Ct. 1371, 1388–97, 63 L.Ed.2d 639 (1980) (White, J., dissenting). *Payton* held that the police must obtain a warrant in order to make a routine felony arrest of a suspect in his own home. 445 U.S. at 602–03, 100 S.Ct. at 1388–89 (plurality opinion). The dissenting opinion of Mr. Justice White, joined by the Chief Justice and Mr. Justice Rehnquist, argues that, under the common law, which is "highly relevant to the present scope of the Fourth Amendment," *id.* at 604, 100 S.Ct. at 1389, the police were required only to announce their *presence* and to demand, and be denied, admittance before forcibly entering a suspect's home to effect a daytime felony arrest. *Id.* at 616, 100 S.Ct. at 1395. These views find support in the plurality opinion in *Ker. See Ker,* 374 U.S. at 38, 83 S.Ct. at 1632 (exigent circumstances) (plurality opinion).

7. *See, e.g., United States v. Baker,* 638 F.2d 198, 202 n. 7 (10th Cir.1980) ("knock-announce" rule incorporated "to some extent" in fourth amendment) (dictum); *United States v. Valenzuela,* 596 F.2d 824, 830 (9th Cir.) (same) (dictum), *cert. denied,* 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1979); *United States v. Murrie,* 534 F.2d 695, 698 (6th Cir.1976) (fourth amendment incorporates all elements of § 3109) (dictum); *United States v. Bustamante–Gamez,* 488 F.2d 4, 9 (9th Cir.1973) (requirements of § 3109 incorporated, "to some extent," in fourth amend-

258 (6th Cir.) ("Though each case by itself is less than compelling, their conclusion has been unanimous: the fourth amendment forbids the unannounced, forcible entry of a dwelling in the absence of exigent circumstances.") (unannounced entry of *business* premises) (dictum), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 637, 70 L.Ed.2d 616 (1981).

A "knock and announce" requirement provides far less privacy protection than the Warrant Clause of the Fourth Amendment, but it nevertheless serves important fourth amendment purposes by preventing needless destruction of private property, eliminating unnecessary intrusions upon privacy, and reducing the risk of violence. *United States v. Bustamante–Gamez,* 488 F.2d 4, 9 (9th Cir.1973), *cert. denied,* 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974).[8] Since compliance normally consumes little time and may be excused in exigent circumstances, *Sabbath v. United States,* 391 U.S. 585, 591 n. 8, 88 S.Ct. 1755, 1759 n. 8, 20 L.Ed.2d 828 (1968); *United States v. Baker,* 638 F.2d 198, 202 (10th Cir.1980), a "knock and announce" requirement, reasonably tailored to the attendant circumstances, generally imposes little burden on law enforcement personnel while promoting important fourth amendment interests, *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed. . . .") It is imperative that any articulation of a constitutional "knock and announce" requirement be informed by the fundamental fourth amendment principle "that 'the permissibility of a particular law enforcement practice is judged by balancing its intrusion on . . . Fourth Amendment interests against its promotion of legitimate governmental interests.' *Delaware v. Prouse,* 440 U.S., [648] at 654 [99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979) ]." *Texas v. Brown,* 460 U.S. 730, 739, 103 S.Ct. 1535, 1541, 75 L.Ed.2d 502 (1983) (plurality opinion) ("plain view" doctrine applied in context of automobile stop).

### 1. Reasonableness of Forcible Entry

The *constitutionality* of a forcible entry does not depend upon ritual

8. ment), *cert. denied,* 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974); *United States v. Mapp,* 476 F.2d 67, 75 (2d Cir.1973) (merger of § 3109 and fourth amendment) (citing *United States v. Manning,* 448 F.2d 992, 1002 (2d Cir.) (en banc rehearing), *cert. denied,* 404 U.S. 995, 92 S.Ct. 541, 30 L.Ed.2d 548 (1971)); *United States ex rel. Manduchi v. Tracy,* 350 F.2d 658, 660–61 (3d Cir.) (forcible entry incident to execution of search warrant, after knocking and waiting "a few seconds," not unreasonable in circumstances; § 3109 held inapplicable), *cert. denied,* 382 U.S. 943, 86 S.Ct. 390, 15 L.Ed.2d 353 (1965).

#### i. Prevention of Needless Destruction

The care with which the officers forced their way into the Daoust residence avoided any unnecessary damage to the premises. The defendant has not suggested any other means by which the search warrant could have been executed in a timely manner by less destructive means in the circumstances confronting these officers.

Of course, in different circumstances, as where the premises are in fact occupied, announcement of the police purpose, i.e., execution of the search warrant, could dispel an occupant's anxiety that the police entry was unauthorized. There is no doubt that this would be a closer case had there not been ample reason for the police to conclude (correctly), on the basis of their previous visits and the absence of any response to their knocking and announcement of their presence and identity, either that the premises were vacant or that further announcement would elicit no response.

#### ii. Prevention of Unnecessary Intrusions Upon Privacy

The lawful execution of a search warrant occasions a significant intrusion upon privacy even though the premises are vacant. The courts must be especially vigilant in circumstances which are conducive to a clandestine general search of unattended papers and effects. In the present case there is no evidence that the officers exceeded the scope of the search warrant, except as concerns the safety sweep for concealed persons. *See* text *infra* at p. 22 *et seq.*

#### iii. Reducing Potential for Violence

The risk of unnecessary violence in the wake of an unannounced forcible entry is reduced most effectively by an announcement of the *police presence,* rather than by announcement of their specific purpose. In the circumstances of the present case it would have been more prudent for the officers to announce their purpose notwithstanding the likelihood that the premises were vacant or that any occupant would not respond. Nevertheless, failure to do so occasioned no unnecessary damage to the premises, no avoidable intrusion upon privacy, and no increased risk of violence.

adherence to the statutory "knock and announce" procedures of section 3109, but is to be assessed against the fourth amendment proscription of *unreasonable* searches.[9] *See Ker v. California*, 374 U.S. at 38, 83 S.Ct. at 1632 (plurality opinion); *Martelle*, 252 A.2d at 319 ("The execution of the [search] warrant will withstand attack on constitutional grounds provided it does not amount to a breach of the constitutional mandate that people be secure in their persons, houses, papers and possessions from all *unreasonable* searches and seizures.") (emphasis in original). The fourth amendment "secures the persons, houses, papers, and effects of the people against *unreasonable* searches and seizures...." *Texas v. Brown*, 460 U.S. at 735, 103 S.Ct. at 1539 (plurality opinion) (emphasis added).

A principled approach to the present inquiry requires recognition of "the Fourth Amendment's central requirement of reasonableness...." *Id.* at 739, 103 S.Ct. at 1541. The reasonableness of the challenged conduct must be viewed in light of "what the officers had reason to believe *at the time of their entry*," *Ker*, 374 U.S. at 40–41 n. 12, 83 S.Ct. at 1633 n. 12 (emphasis in original); *see United States v. Bustamante–Gamez*, 488 F.2d 4, 10–12 (9th Cir. 1973), *cert. denied*, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974), and by balancing the official intrusion against whatever legitimate governmental interests it serves, *see Delaware v. Prouse*, 440 U.S. at 654, 99 S.Ct. at 1396.

The officers had visited the Daoust residence on several previous occasions, at a different time of day on each occasion, without ever finding anyone at home. The officers announced their *presence* "loud and clear," by knocking on the cellar door and by yelling "police," *see Sabbath*, 391 U.S. at 591 n. 8, 88 S.Ct. at 1759 n. 8 ("... possible constitutional rule relating to *an-*

*nouncement and entry* ...") (emphasis added); *but cf. Jackson*, 354 F.2d at 982 (discussing Massachusetts *common law* "knock and announce" requirement: "[T]he officers' bare announcement, 'Sam, police,' did not 'notify the [occupant] ... that they demanded admission to his apartment for the purpose of arresting him.'") (citing *Miller v. United States*, 357 U.S. at 310, 78 S.Ct. at 1196) (applying § 3109), and after announcing their presence the officers allowed several minutes to pass, during which there was no response from within the residence, before forcing the latch on the cellar window. There were no indications of occupancy: no lights, no animals, no vehicles in the driveway, and no sound.

Although it directly implicates only section 3109, the decision in *United States v. Brown*, 556 F.2d 304 (5th Cir.1977), affords an instructive analog.

Agents of the Alcohol, Tobacco, and Firearms Bureau obtained a valid warrant to search appellant's residence for unregistered firearms. Accompanied by a local deputy sheriff who knew appellant, the federal agents surrounded the house, knocked on doors and windows, and announced their identity. They did not announce that they had a search warrant. There was no response to their knocks and calls, so, assuming that Brown was not on the premises, the officers dispatched the deputy sheriff to find Brown. After searching for over an hour without locating Brown, the deputy sheriff returned to the residence where the federal officers were keeping watch. Again *they knocked and announced their identity, but they did not announce their purpose* —the execution of the warrant. Being reasonably certain that the residence was unoccupied, the agents broke a pane of glass, unlocked a door and entered. They found an unregistered machine gun in the house. The house was, in fact, unoccupied.

---

**9.** The United States Supreme Court has not determined that the fourth amendment incorporates the particular "knock and announce" procedures delineated in § 3109. *See Sabbath v. United States*, 391 U.S. 585, 591 n. 8, 88 S.Ct. 1755, 1759 n. 8, 20 L.Ed.2d 828 (1968) ("Exceptions to any *possible* constitutional rule relating

to *announcement* and *entry* have been recognized....") (emphasis added); 2 W. LaFave, *Search and Seizure* § 4.8(a), at 271. *See supra* note 6. *But cf. Miller*, 357 U.S. at 306–310, 78 S.Ct. at 1194–96 (applying local District of Columbia criteria identical to § 3109, in exercise of supervisory power of court) (dictum).

556 F.2d at 305 (emphasis added). As the Fifth Circuit concluded in *Brown,* "it is futile to require police to wait for refusal of admittance to an unoccupied dwelling.... Clearly, it is just as futile to announce to an unoccupied building that federal officers have a search warrant." *Id. Cf. Payne v. United States,* 508 F.2d 1391 (5th Cir.1975). In these very similar circumstances, *Brown* held that the officers did not violate section 3109 by forcibly entering a dwelling without an announcement of their *purpose. Brown,* 556 F.2d at 305. Although the officers in *Brown* waited more than an hour before forcing their way into the residence, the extended delay was necessary to allow time for a deputy sheriff to attempt to locate the owner *elsewhere. Brown,* 556 F.2d at 305. *Cf. Jackson,* 354 F.2d at 982 (mere ten second pause not unreasonable).

The police may execute a search warrant in a vacant dwelling. *See United States v. Gervato,* 474 F.2d 40, 43 (3d Cir.) (forcible entry of apartment after knocking and announcing identity and purpose, despite known absence of tenant), *cert. denied,* 414 U.S. 864, 94 S.Ct. 39, 38 L.Ed.2d 84 (1973). Unless the officers were to abdicate their responsibility to execute the search warrant, a forcible entry was unavoidable in these circumstances. Considering the uniformly unsuccessful earlier efforts of the officers to elicit a response from within the residence, and their duty to execute the search warrant, their forcible entry could be invalidated only by ritual insistence upon an announcement of purpose in circumstances which objectively demonstrate that it would have elicited no response, let alone result in their admittance. *See Jack-*

*son,* 354 F.2d at 982 ("The government cannot be faulted for deficiencies having no prejudicial effect.")

The forcible entry of the Daoust residence in these circumstances violated neither section 3109 nor any fourth amendment "knock and announce" requirement.

### 3. *Execution of Search Warrant*

■ The search warrant directed the officers to enter and search the residence and to seize the handgun previously observed by Sperry and MacMaster. Although the warrant does not restrict the scope of the search to any particular part of the premises, immediately prior to their forcible entry Sperry visually confirmed that the handgun remained fastened to the kitchen ceiling. There being no contention that the warrant in these circumstances impliedly authorized a search of the entire premises, either for this weapon or for others, *the question before the court is whether the safety sweep of the second floor was an impermissible "general search." See, e.g., Payton v. New York,* 445 U.S. 573, 583, 100 S.Ct. 1371, 1378, 63 L.Ed.2d 639 (1980) ("It is familiar history that indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment.") (footnote omitted).

### a. *Constitutional Implications of Security Sweeps* [10]

The defendant contends that the safety sweep of the second floor violated the fourth amendment and that the three long guns observed and seized in the upstairs bedroom must be suppressed. The thrust

---

**10.** The term "security sweep" encompasses "protective sweeps" and "safety sweeps." The term "safety sweep" is used to indicate a superficial sweep for concealed *persons,* conducted incident to the execution of a *warrant to search* the premises for evidence. A "safety sweep" differs fundamentally from a "protective sweep," by which is meant a premises *search* incident either to a warrantless *arrest* on probable cause, or to a warranted *arrest* of a person *other than the owner* of the premises, *see, e.g., Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); *United States v. Curzi,* 867 F.2d 36 (1st Cir.1989), or to a *warrantless search*

of the same premises. The distinction is important. A *search* warrant assures that a detached magistrate has found probable cause to *enter and search* at least some portion of the premises. A "protective sweep," on the other hand, is conducted incident to a *warrantless* search, or a *warrantless* arrest, or to the execution of a *warrant* for the *arrest* of a person *other than the owner* of the premises, none of which entails any determination by a *neutral magistrate* that there is probable cause *either to enter, or to search,* the premises for *any purpose. See Steagald,* 451 U.S. at 214 n. 7, 101 S.Ct. at 1648 n. 7.

of the argument is that the fourth amendment does not permit a superficial safety sweep incident to the execution of a search warrant immediately after the police forcibly enter an unoccupied residence without having announced their specific purpose. Relieved of its overburden the unarticulated rationale for this argument is that the failure of the officers to announce their specific purpose can be countenanced, as a constitutional matter, *only* if there existed a reasonable basis to believe that the premises were *un*occupied, thus preempting the only conceivable basis for the ensuing safety sweep for concealed persons.

The government counters that the safety sweep was lawful under the exigent circumstances "exception" to the warrant requirement, *see, e.g., Steagald v. United States,* 451 U.S. 204, 212, 101 S.Ct. 1642, 1647, 68 L.Ed.2d 38 (1981); *United States v. Curzi,* 867 F.2d 36, 41 (1st Cir.1989), because the officers could not be sure that the premises were unoccupied, and they

knew that Daoust was a convicted felon, with a criminal record for assaultive conduct, that there was at least one firearm in the Daoust residence and that Daoust associated with a suspected cocaine dealer. The government principally relies on *United States v. Castillo,* 844 F.2d 1379 (9th Cir.1988).[11]

### 1. Security Sweeps

The court examines the soundness of the silent premise underlying the defendant's contention; namely, that the issues implicated by the forcible entry and the safety sweep are controlled by the same constitutional constraints.[12]

#### a. Protective Sweeps

The analysis begins with an examination of analogous precedent relating to "protective sweeps."[13]

The Supreme Court has not recognized any general "protective sweep" excep-

---

**11.** Prior to the filing of the government's "Supplemental Memorandum," *United States v. Castillo,* 844 F.2d 1379 (9th Cir.1988), was superseded by *United States v. Castillo,* 866 F.2d 1071 (9th Cir.1988).

**12.** Other questionable assumptions underpin the defendant's position as well. For example, can the failure of the police to announce their specific purpose, after knocking and announcing their presence, be excused only on the basis of a reasonable belief that the premises were unoccupied? In the present circumstances a reasonable person might well conclude that announcement of the specific police purpose and authority would have been futile even if the premises were occupied; in other words, that anyone who might have been inside was not about to admit them. *Cf. Jackson,* 354 F.2d at 982 ("Ten seconds might be a short time for him (defendant-occupant) to reach both doors (outside door and apartment door), but ten seconds of silence in this case could mean that the occupant had not even started, and hence was not going to.") It would seem reasonable in the present circumstances for the officers to conclude that several minutes was enough time to allow an occupant to admit them, and to infer from the lack any response either that the premises were unoccupied *or* that any occupant intended to refuse them admittance. *See United States v. Bustamante–Gamez,* 488 F.2d 4, 11 (9th Cir.1973) (§ 3109 case: "refusal of admittance" generally is to be implied; test is whether reasonable man would believe that admittance had been refused), *cert. denied,* 416 U.S. 970, 94 S.Ct.

1993, 40 L.Ed.2d 559 (1974); *McClure v. United States,* 332 F.2d 19, 22 (9th Cir.1964) ("[R]efusal of admittance contemplated by [section 3109] ... will often times be present only by implication.") (footnote omitted), *cert. denied,* 380 U.S. 945, 85 S.Ct. 1027, 13 L.Ed.2d 963 (1965). It is clear, however, that the officers need not only have concluded that the premises were unoccupied, as there was no way that the mere absence of a response, and the lack of indicia of occupancy, could *assure* them that no one was inside the residence. And where the safety of the officers is at stake it is reasonable that they be allowed to employ the precaution of a cursory safety sweep to *assure* that they are not at unnecessary risk during the execution of a search warrant.

Of course, where an announcement of police purpose is required, the police are not free to disregard it. *See, e.g., Jackson,* 354 F.2d at 982 ("There should have been a reference to the warrant.") Absent a specific statutory mandate, however, officers attempting to execute a valid search warrant, after having been unable to raise the owner on numerous occasions, violate no constitutional standard of reasonableness in these circumstances by forcibly entering the premises without first announcing their specific purpose. That is to say, the court has found no authority which suggests that a fourth amendment reasonableness test requires an announcement of the specific police purpose *in all circumstances.*

**13.** *See supra* note 10.

tion to the warrant requirement. *See generally* Comment, *Clean Sweeps: Protecting Officer Safety and Preventing the Imminent Destruction of Evidence,* 55 U.Chi.L.Rev. 684 (1988). Nor has this court sought to create one. Our view has been—and remains—exactly opposite: "a 'protective sweep' is 'no more lightly taken than any other instance where the government seeks to justify an unwarranted search.'" *United States v. Gerry,* 845 F.2d 34, 36 (1st Cir.1988) (quoting *United States v. Hatcher,* 680 F.2d 438, 443 (6th Cir. 1982)). *Without benefit of search warrants,* security sweeps are constitutionally impermissible unless (a) supported by probable cause, and (b) justified by consent, exigency, or some other acceptable reason for bypassing the usual constraints of the fourth amendment. *See United States v. Gerry,* 845 F.2d at 36; *United States v. Veillette,* 778 F.2d 899, 902–03 (1st Cir.1985), *cert. denied,* 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986).

*United States v. Curzi,* 867 F.2d 36, 41 (1st Cir.1989) (textual emphasis added).

*Curzi* involved a protective sweep [14] following the execution of a warrant for the *arrest* of a person *other than the owner* of the residence. Although the police had ample opportunity to obtain a *search* warrant before entering the *defendant-owner's* home, *Curzi,* 867 F.2d at 42; *cf. United States v. Veillette,* 778 F.2d 899 (1st Cir. 1985), *cert. denied,* 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986), they did not attempt to do so, *Curzi,* 867 F.2d at 42. Judge Selya accordingly acknowledged in *Curzi* that some "acceptable reason for bypassing the usual constraints of the fourth amendment" is necessary to justify a protective sweep in the absence of a *search warrant. Curzi,* 867 F.2d at 41.[15] Absent *consent, exigent* circumstances, or a *search warrant,* the *Curzi* court unexceptionably struck down the protective sweep as a violation of the Warrant Clause of the Fourth Amendment. *Curzi,* 867 F.2d at 41–46, *aff'g,* 699 F.Supp. 995 (D.Mass.1988).

### b. Safety Sweeps

*Curzi* is inapposite to the present analysis. The *Curzi* protective sweep, conducted incident to the execution of a *warrant* for the *arrest* of a person *other than the owner* of the premises, clearly was unconstitutional under *Steagald,* absent either consent or exigent circumstances. *Steagald,* 451 U.S. at 213, 101 S.Ct. at 1648. Just as clearly, *Steagald* does not control the constitutionality of the present safety sweep, which was conducted incident to the execution of a *search* warrant. *Steagald* in fact explains the constitutional significance of the distinction between *Curzi* and

---

**14.** The First Circuit in *Curzi* described a "protective sweep" conducted incident to the execution of an *arrest* warrant.

> When we allude to a protective sweep, we refer, in general, to the right of arresting officers to conduct a limited search of part or all of the premises in question for purposes of security or evidence preservation. We agree, in principle, with the Second Circuit's formulation of the protective sweep doctrine:
>
> Law enforcement officers may conduct a security check—a quick and limited pass through the premises to check for third persons—without a warrant when making an arrest on private premises when they reasonably fear that other persons are lurking within who may pose a threat to their safety or are likely to destroy evidence.
>
> *United States v. Escobar,* 805 F.2d 68, 71 (2d Cir.1986). *See generally United States v. Gerry,* 845 F.2d 34, 36 (1st Cir.1988); *United States v. Veillette,* 778 F.2d 899, 902 & n. 1 (1st

Cir.1985), *cert. denied,* 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986).

*Curzi,* 867 F.2d at 39, n. 2. Although *Curzi* does not differentiate between a "protective sweep" and a "safety sweep," it is clear from its facts, as well as those in *Escobar,* that the focus in *Curzi* was on a security sweep (however denominated) incident to some law enforcement action *other than the execution of a search warrant. See supra* note 10.

**15.** The First Circuit followed the lead in *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). *Curzi,* 867 F.2d at 39. *Steagald,* like *Curzi,* dealt with the "... narrow issue ... whether an *arrest* warrant—*as opposed to a search warrant*—is adequate to protect the Fourth Amendment interests of persons *not named in the warrant,* when *their homes are searched* without their consent and in the absence of exigent circumstances." *Steagald,* 451 U.S. at 212, 101 S.Ct. at 1647 (emphasis added).

54

the present case.[16]

> Because an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of *that person's privacy interest* when it is necessary to arrest him *in his home*. This analysis, however, is plainly inapplicable when the police seek to use an arrest warrant as legal authority to enter the home of a *third party* to conduct a search. Such a warrant embodies no judicial determination whatsoever regarding the person whose home is to be searched.

*Steagald,* 451 U.S. at 214 n. 7, 101 S.Ct. at 1649 n. 7. *See supra* notes 10, 14, 15. On the other hand, the present case is essentially indistinguishable from *Castillo,*[17] except that the entry and protective sweep in *Castillo* were not conducted under the auspices of a *search warrant,* but incident to the execution of a *warrant* for the *arrest* of the *owner of the premises.* The search warrant in the present case provided *no less* protection than an arrest warrant would have afforded the defendant. *See Payton v. New York,* 445 U.S. 573, 602, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980) ("It is true that an arrest warrant requirement may afford less protection than a search warrant requirement, but it will suffice to interpose the magistrate's determination of probable cause between the zealous officer and the citizen.")

The United States Supreme Court has yet to determine whether a valid search warrant implicitly authorizes a safety sweep of areas within the search premises which could conceal a person who might pose a risk to the safety of the officers while executing the warrant. Nevertheless, analogous Supreme Court precedent suggests that a safety sweep in the present circumstances was not violative of the fourth amendment. *See, e.g., Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (police may search passenger compartment of suspect's car on reasonable belief that the suspect poses danger to officers); *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (no violation of fourth amendment safeguards against unreasonable seizures where police require suspect to re-enter own house and to remain there during execution of *search warrant* ); *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (*warrantless search* of suspect's house, extending beyond area within which suspect may reach weapon or destroy evidence, held invalid); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("stop and frisk," on reasonable belief suspect may be armed and dangerous, held valid seizure of suspect's person).

Reasonableness is the ultimate test of any search and seizure under the fourth amendment. *See Michigan v. Summers,* 452 U.S. at 699–700, 101 S.Ct. at 2592–2593 (". . . the Court was applying the ultimate standard of reasonableness embodied in the Fourth Amendment"). *Summers* recog-

---

**16.** More precisely, perhaps, *Steagald* demonstrates the constitutional significance of the distinction between *Curzi* and *Castillo,* 866 F.2d 1071 (9th Cir.1988). Of course, *Curzi* and *Castillo* are readily reconcilable, nevertheless, on the basis that ". . . the arrest warrant [in *Curzi* ] was inadequate protection for the privacy rights of a *resident not named therein,*" *Curzi,* 867 F.2d at 39 (emphasis added), whereas in *Castillo* there was a valid warrant for the *arrest* of the *owner* of the premises. *See also Steagald,* 451 U.S. at 214 n. 7, 101 S.Ct. at 1648 n. 7.

**17.** The defendants in *Castillo* were believed to be involved in a large and dangerous cocaine conspiracy, whereas the present record merely evidences that the officers were investigating the defendant's association with a suspected cocaine trafficker as to whom the record is silent concerning the volume of suspected drug activity, and there is no *direct* evidence that the suspected cocaine trafficker was believed to be violent. *Cf. United States v. Flickinger,* 573 F.2d 1349, 1355 (9th Cir.) ("when the police do not have a reasonable basis for believing the suspect is armed beyond his alleged participation in non-violent criminal activity, that fact alone is insufficient to demonstrate exigency"), *cert. denied,* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978), *overruled on standard of review, United States v. McConney,* 728 F.2d 1195, 1205 (9th Cir.), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). *Flickinger* concerned warrantless arrests, while the case at bar concerns a safety sweep pursuant to a search warrant. On the other hand, Daoust's felony conviction and record of assaultive criminal conduct gave the officers concrete cause for caution upon entering Daoust's residence, where at least one firearm was known to be present.

55

nizes that reasonableness depends upon "... both the character of the official intrusion and its justification." *Id.* at 701, 101 S.Ct. at 2593. As the Supreme Court observed in *Summers:*

> Of *prime importance* in assessing the intrusion is the fact that the police had obtained a warrant to search respondent's house for contraband. A neutral and detached magistrate had found probable cause to believe that the law was being violated in that house and had authorized a substantial invasion of the privacy of the persons who resided there. The detention of one of the residents while the premises were searched, although admittedly a significant restraint on his liberty, was surely less intrusive than the search itself.

*Id.* at 701, 101 S.Ct. at 2593 (emphasis added) (footnote omitted).

*Summers* relied principally upon the prophylaxis of the probable cause determination by a neutral magistrate prior to the issuance of the warrant to search the premises within which the owner was detained. The initial detention of the owner of the search premises in *Summers* was predicated on his "... connection [to those premises,] ... [which gave] the ... officer[s] an easily identifiable and *certain* basis for determining that suspicion of criminal activity justifie[d] ... [plaintiff's] detention...." *Summers,* 452 U.S. at 703–704, 101 S.Ct. at 2594–2595 (emphasis added). Similarly, the officers executing the search warrant in the Daoust residence were left with no constitutionally significant discretion, inasmuch as the search warrant itself specified the object and scope of the search, and the independent probable cause determination by a neutral judicial officer—that there was a firearm on the premises of a convicted felon—provided an objective basis for a reasonable suspicion of risk to the safety of the officers while executing the search warrant.[18]

Following several unsuccessful precautionary investigations aimed at locating the defendant, at his residence and elsewhere, *cf. Brown,* 556 F.2d at 305 (§ 3109 case), the officers determined that a superficial sweep for concealed persons was essential to their safety because they could not reasonably be assured that there would be no other person inside the house while they executed the search warrant, *see* Excerpts of Proceedings on Hearing on Defendant's Motion to Suppress Evidence, at 5, 9, 12, 17, 19, 22. MacMaster, who was in charge of the search party, testified: "If I saw a wide-open space, then I could scan with my eyes. But when I see rooms, I'm going to want to go in those rooms." *Id.* at 16–17. On redirect examination, MacMaster was asked: "Had you known for a fact, absolute fact, that there was no one in that residence, as the leader of a search team, would you have authorized any agents to look anyplace other than but that one kitchen for the gun?" MacMaster answered, "No, I would not have." *Id.* at 17.

All fourth amendment safeguards against unreasonable governmental intrusions upon the privacy of the people in their homes must be faithfully observed, *see, e.g., Castillo,* 866 F.2d at 1079 ("It is

---

**18.** *Castillo* itself upheld a protective sweep on the basis of a reasonable belief that "there *might* be other persons on the premises who *could* pose some danger to [the officers]." *Castillo,* 866 F.2d at 1079 (emphasis added). *See also United States v. Gardner,* 627 F.2d 906, 909–10 (9th Cir.1980). ("[T]he Government must be able to 'point to specific and articulable facts which, taken together with rational inferences from those facts, [would] reasonably warrant [the warrantless] intrusion.'") (footnote omitted in original) (quoting *United States v. Dugger,* 603 F.2d 97, 99 (9th Cir.1979)).

Moreover, unlike *Castillo,* the evidence in the present case would not support a finding that these officers collectively understood that the execution of a search warrant inside a residence invariably permits or requires a safety sweep. At the suppression hearing, Officers Appleton, Sperry and MacMaster testified that it is standard practice to conduct a security sweep for concealed persons incident to the execution of a search warrant, unless the officers can be sure that no one is inside the premises. *See, e.g.,* Excerpts of Proceedings on Hearing on Defendant's Motion to Suppress Evidence (Excerpts of Proceedings), at 3–4, 5, 7, 8, 10, 14. Their testimony differed significantly from the "flip remarks" in *Castillo,* 866 F.2d at 1078–79 (officer testifies that it was "standard procedure to do a protective sweep of the premises"). *But see* Excerpts of Proceedings, at 18 (testimony of Officer Draper).

**56**

our fervent hope that every police officer made aware of this decision will understand that 'routine' violations of the [C]onstitution will in all cases result in the exclusion of evidence and may compel the courts to release a guilty person.") Nevertheless, in these circumstances it was not unreasonable to conduct a superficial safety sweep for persons who might have been concealed in the Daoust residence. Under the auspices of the particular probable cause determinations supporting the search warrant in this case, and given the fact that all prudent alternatives had been exhausted, it was reasonable for the officers to conduct a superficial safety sweep for concealed persons immediately upon entering the premises because there was no other means by which the safety of the officers could be reasonably *assured.*

#### 4. *Seizure of Other Evidence in Kitchen*

■ The presence of the officers in the kitchen was essential to the execution of their mandate to seize the handgun from the ceiling above the kitchen sink. There the black powder musket and the ammunition clip were inadvertently discovered in "plain view," and their incriminating nature was immediately apparent. These items were lawfully seized.[19] *See United States v. Johnston,* 784 F.2d at 419.

Accordingly, the motion to suppress was in all respects *DENIED.*

---

**19.** The court rejects the contention that all items seized from the residence must be suppressed because the search was flagrantly overbroad. *See United States v. Whitten,* 706 F.2d 1000, 1010 (9th Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984). The *search* was not overbroad. Even if the safety sweep of the second floor had been unlawful, there is no suggestion whatever that the officers "searched" for any evidence. Rather, the officers conducted a superficial safety sweep for concealed persons who might pose a danger to the officers during their execution of the search warrant. Whether or not the safety sweep of the second floor was valid, the "plain view" discovery of the musket and the ammunition clip in the kitchen area was unaffected.