**UNITED STATES of America**

v.

**Delon J. ADAMS, Defendant**

**No. CR. 02–64–P–H.**

United States District Court, D. Maine.

Oct. 28, 2002.

Richard W. Murphy, Office of the U.S. Attorney, Portland, ME, for U.S.

David J. Van Dyke, Berman & Simmons, P.A., Lewiston, ME, Jeffrey W. Langholtz, Biddeford, ME, for Delon J. Adams (1) aka Joseph Deleon Adams, defendant.

## ORDER AFFIRMING RECOMMENDED DECISION OF THE MAGISTRATE JUDGE

HORNBY, Chief Judge.

The United States Magistrate Judge filed with the court on October 7, 2002, with copies to counsel, his Recommended Decision on Motions to Suppress. The time within which to file objections expired on October 25, 2002, and no objections have been filed. The Magistrate Judge notified the parties that failure to object would waive their right to *de novo* review and appeal.

It is therefore ORDERED that the Recommended Decision of the Magistrate Judge is hereby ADOPTED. The defendant's motions to suppress are DENIED.

So ORDERED.

## *RECOMMENDED DECISION ON MOTIONS TO SUPPRESS*

LAWRENCE P. COHEN, United States Magistrate Judge.

Delon J. Adams, charged with one count of being a felon in possession of a firearm (a Sturm Ruger 9–millimeter pistol, serial number 306–17722) in violation of 18 U.S.C. §§ 922(g)(1) and 924 and two counts of knowingly using, carrying and brandishing the same firearm in relation to a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(ii), seeks to suppress (i) statements made to two Biddeford, Maine detectives on or about March 18, 2002 and (ii) the fruits of an allegedly illegal automobile stop and search in Hollis, Maine on October 8, 2001. Superceding [sic] Indictment (Docket No. 16); Motion To Suppress Statements ("Motion/Statements") (Docket No. 13); Defendant's Memorandum of Points and Authorities in Support of Motion To Suppress Statements ("Memorandum/Statements") (Docket No. 13);

Motion To Suppress Unwarranted Automobile Stop and Search and All Fruits from That Search ("Motion/Car Stop") (Docket No. 14); Defendant's Memorandum of Points and Authorities in Support of Motion To Suppress Unwarranted Automobile Stop and Search and All Fruits from That Search ("Memorandum/Car Stop") (Docket No. 14).

An evidentiary hearing was held before me on September 27, 2002 at which the defendant appeared with counsel. The government called three witnesses and introduced two exhibits, which were admitted without objection. Both parties declined an opportunity for oral argument or submission of post-hearing memoranda, preferring to rest on the papers previously submitted. Based on the evidence adduced at the hearing, I recommend that the following findings of fact be adopted and that both motions to suppress be denied.

## I. Proposed Findings of Fact

On October 8, 2001 Maine State Police ("MSP") trooper Eric Bergquist was on duty patrolling rural northern York County when, at approximately 3:30 p.m., he received word through an MSP sergeant to be on the lookout for a black Volkswagen Jetta bearing Maine license plate 8884GL. Bergquist was informed that a female identifying herself as "Laurie Adams" of Hollis, Maine had attempted for the second time in a short period of time to purchase a handgun at the Kittery Trading Post ("KTP"), raising suspicions at that establishment, and that a KTP surveillance camera had videotaped her getting into the Jetta with a black male and a white male. Hollis was within Bergquist's patrol area. Bergquist understood that his mission with respect to the Jetta was to identify the two males—*i.e.,* to find the Jetta, stop it if he could and identify its occupants.

While continuing to patrol, Bergquist called MSP dispatch and requested a registration check—a so-called "1028" or "NLETS" check—on the license plate number he had been given for the Jetta. The MSP dispatcher reported that the registration in question named Laurie Chute as owner of a red Dodge Neon, not a black Volkswagen Jetta. *See* Gov't Exh. Supp.–2 (printout of information that Bergquist was given orally on October 8, 2001). Bergquist had received instruction on traffic laws from which he understood that it was illegal to attach plates from one vehicle to another.

At about 6 p.m. Bergquist spotted what appeared to be the black Jetta directly behind him. In his rear-view mirror, he could make out part of the car's license plate, which appeared to match the number "8884GL." He could also see that the car contained three occupants matching the descriptions he had been given (a black male, a white male and a white female). The Jetta turned right on Sarah Vaughn Road. Bergquist made a U-turn and pursued the Jetta. As he approached it from behind, he could clearly see the full license plate number, which matched the number he had been given. He then activated his blue flashing lights and pulled the Jetta over.

Bergquist approached the driver, a black male, and asked him for his license, registration and proof of insurance. The driver asked why he had been pulled over, and Bergquist responded that there had been a speeding complaint. This was a deliberate ruse. Bergquist, who had no intention of revealing that there were any concerns about firearms purchases, believed that if he told the car's occupants the Jetta had been pulled over for improper license attachment (thereby suggesting that he had been doing some prior check-

ing), they would suspect that something was afoot.

The driver produced a registration for the Jetta but no driver's license. The registration papers revealed that the license plates were in fact properly affixed, Laurie Adams having switched them from the Neon to the Jetta. Bergquist surmised that this had not surfaced during the 1028 check because the information, which likely would be forwarded in paper format from the town hall, had not yet been entered into the Bureau of Motor Vehicles' computerized data bank.

The driver, who said that he had a New York driver's license (although he did not then produce it), gave Bergquist his name (Delon Adams) and date of birth. Bergquist also asked for identification from the two passengers. He then contacted the MSP radio communications center in Gray, Maine ("Gray–RCC") and requested that a "1027," or license check, be run on all three occupants of the Jetta. Gray–RCC reported back to Bergquist that Adams had no valid license in Maine or New York. Bergquist double-checked with Adams to make sure he had spelled his name correctly and asked Gray–RCC to run a confirmatory license check with the New York state police. This check revealed that Adams' New York driver's license was suspended. Bergquist then placed Adams under arrest for operating a vehicle without a license and patted him down to check for weapons, finding none.

The license of the white male, Eric Studer, was reported by Gray–RCC to be under suspension. Bergquist patted Studer down to check for weapons, again finding none, explained that his license was suspended, asked him if he had anything in the vehicle and directed him to stand some distance away. Laurie Adams' driver's license gave her name as "Laurie Chute"; however, the 1027 check revealed that she

had changed her last name from Chute to Adams. Bergquist asked her if she had any weapons. She hesitated and then acknowledged that she had a gun in the car. Bergquist asked her where the gun was. She replied that it was under the seat. He asked her if it was loaded; she responded that it was. Finally, he asked her if she had a concealed weapons permit, and she said she did not. Bergquist had reason to believe Adams had committed two violations: carrying a weapon in a vehicle without a concealed-weapons permit and carrying a loaded firearm in a vehicle.

Bergquist then searched the Jetta, finding two loaded firearms under the driver's seat. He placed Laurie Adams under arrest. The Jetta ultimately was towed to an MSP barracks in Alfred, Maine where it was searched more thoroughly and nothing else of note was found. The two firearms seized from the vehicle were placed in an MSP evidence locker. Bergquist was alone during much of the Jetta stop, although eventually a deputy sheriff arrived as backup. He made the stop at about dusk on a dirt road with no street lights and only one house visible, although set well back from the road.

On March 18, 2002 Biddeford Police Department ("BPD") detectives Philip Greenwood and Terry Davis participated in the execution of a warrant to search an apartment at 61 High Street in Biddeford, where Adams then was living. Greenwood and Davis were investigating what they believed were multiple robberies of people involved in narcotics trafficking. Toward the beginning of the search Adams was arrested, taken to the Biddeford police station and placed in a holding cell on the building's first floor. Greenwood and Davis, neither of whom spoke to Adams at that time, remained at the search site.

At approximately 3:30 p.m. Greenwood returned to the police station. He interviewed one of Adams' associates, Sarah Blake, for about an hour. Then, shortly before 5 p.m., Davis (who had also returned from the search site) escorted Adams from the holding cell to a small room nearby used for intoxilyzer tests and interviews, where Greenwood and Davis interviewed Adams.

The intoxilyzer room, which measures approximately eight feet by ten feet, is equipped with an intoxilyzer unit on a table next to a chair, a desk with two chairs and a filing cabinet. It is an interior room with no windows. Unlike two other rooms in the police station that are used for interviews, one upstairs and one downstairs, the intoxilyzer room is not equipped with recording equipment. Hence, the Adams interview was not recorded, although Greenwood took handwritten notes that he destroyed per his usual practice after typing up his official report.[1]

At the commencement of the interview, Greenwood read Adams his *Miranda* rights from a preprinted form, recording Adams' responses thereon. *See* Gov't Exh. Supp. 1.[2] When asked whether he understood each of these rights, Adams responded, "Yes I do." *See id.* Adams never hesitated or appeared not to understand these rights.

During the interview Greenwood and Adams sat and Davis alternately sat and stood near the intoxilyzer-unit table. Nei-

---

1. With respect to the decision to use the intoxilyzer room rather than another interview room at the police station, both detectives recalled having security concerns about moving Adams away from the cell-block area of the station.

2. Greenwood testified that he erroneously wrote "14:47" on the *Miranda* form. In fact, the time was 16:47, or 4:47 p.m.

ther Greenwood nor Davis was armed. Adams, who was wearing street clothes, was not restrained by handcuffs, leg irons or in any other fashion. He did not appear to be under the influence of any intoxicants, his speech was clear and coherent, he appeared to have no trouble hearing or understanding the detectives, and he struck both detectives as intelligent, articulate and well-spoken. At the beginning of the interview Greenwood obtained a cold soft drink for Adams. The general tenor of the interview was cordial and pleasant, even initially jovial, with the detectives joking that Adams had been foolish to trust those around him who later informed on him, and Adams seeming both surprised and amused. Not once during the interview, which lasted approximately one hour, did either Adams or the detectives raise their voices, shout or yell.

Throughout the interview Greenwood, who served as the primary interviewer, encouraged Adams to cooperate, telling him it ultimately would be in his best interest to cooperate, it might place him in a better position to negotiate a resolution of his problems, and that he (Greenwood) would "reflect" Adams' cooperation to the district attorney's office. This was a standard speech Greenwood gave to arrestees. However, Greenwood made no promises or representations concerning how Adams would be charged or ultimately sentenced. By "cooperation," Greenwood meant confession to participation in robberies and use of a firearm in their commission; however, he did not explain this term to Adams.

Greenwood also told Adams that the detectives were aware of incriminating information concerning Adams, including information given by his co-conspirator Christopher Wright and his girlfriend, Sarah Blake, whom Greenwood had just finished interviewing. Adams was surprised

that people he had robbed would inform on themselves in an effort to inform on him. He confessed that he had participated in robberies but denied use of a gun in the course of their commission.

At the end of the interview, after having confessed to participating in robberies, Adams offered to provide narcotics information to the detectives and actively work for them in their drug-enforcement activities if they secured his release from jail. He specifically offered to place a call to a narcotics source. Some discussion of this possibility ensued, but the call ultimately was not placed, and the detectives told Adams that they did not believe the sought-after release from jail would come to pass. At the conclusion of the interview, Adams was returned to his holding cell. Greenwood believed it was clear to Adams throughout the interview that he was under arrest and would not be permitted to leave.

At the time Greenwood prepared an affidavit supporting the BPD's request for the search warrant that was executed at 61 High Street on March 18, he was not aware that Adams had been stopped the previous year by the MSP and arrested for driving without a license or that any firearms had then been seized. Indeed, as of March 18, neither Greenwood nor Davis was aware of the October 8, 2001 stop.

## II. Discussion

### A. Motion To Suppress Automobile Stop

With respect to Bergquist's October 8, 2001 stop of the Jetta, Adams moves to suppress the stop and search and "all fruits of that search and of all subsequent investigative activities arising out of and deriving from that stop and search pursuant to the 'fruit of the poisonous tree' doctrine and otherwise." Memorandum/Car Stop at 1. Adams posits that the

investigation that led to his arrest on the instant charges "flowed *directly* from evidence obtained during that initial stop and search on October 8, 2001 in Hollis, Maine: Although the police may have subsequently and independently obtained the Defendant's name as a suspect in a series of armed robberies from Christopher Wright . . . it is only the challenged improper stop and search which tied Defendant to the subject firearms." *Id.* at 3 (emphasis in original).

■ As the government points out, even assuming *arguendo* that the October 8, 2001 car stop and search were illegal, Adams' motion rests on a mistaken premise: that the October stop tied him to the firearms seized in March. *See* Government's Consolidated Response and Objections to Defendant's Pretrial Motions ("Response") (Docket No. 18) at 8–9. In fact, the evidence adduced at hearing made clear that the March search and seizure did not in any respect flow out of the October stop. Thus, even assuming the existence of a "poisonous tree," the seizure of the Ruger pursuant to a search warrant on March 18, 2002 could not have been its "fruit." *See, e.g., United States v. Ford,* 22 F.3d 374, 379 (1st Cir.1994) (search pursuant to warrant was not tainted by prior allegedly impermissible protective sweep inasmuch as valid warrant to search defendant's home would have issued even in absence of information obtained in course of protective sweep).

In any event, I find no underlying illegality in either the stop or seizure of weapons on October 8, 2001. Adams posits that Bergquist had no probable cause to stop the Jetta in that Laurie Adams' KTP dealings were not illegal and "[t]he registration discrepancy [did] not constitute probable cause, especially in light of Ms. Adams' truthful representations, upon post-stop questioning, that she was in possession of

firearms." Memorandum/Car Stop at 4. Further, in Adams' view, "[c]ircumstances essentially deliberately *created* by the police cannot justify a warrantless search." *Id.* at 5 (emphasis in original).

However, the "threshold for probable cause in a criminal case is low[.]" *Suboh v. District Attorney's Office of Suffolk Dist.,* 298 F.3d 81, 96 (1st Cir.2002). Probable cause exists "when the facts and circumstances within [the police officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense." *Id.* (citation and internal quotation marks omitted). As part of his training Bergquist had been apprised—correctly—that in Maine affixing the wrong license plates to a vehicle is a criminal offense. *See* 29–A M.R.S.A. § 2104(1) ("A person commits a Class E crime if that person attaches or permits to be attached to a vehicle a registration plate assigned to another vehicle or not currently assigned to that vehicle.").

■ Based on "reasonably trustworthy" information—the 1028 search result that the license plate in question should have been attached to a red Neon, together with Bergquist's personal observation that the license plate in question was attached to a black Jetta—Bergquist had probable cause to believe that the offense of attaching the wrong license plates to the Jetta had been committed. *See, e.g., United States v. Ferguson,* 8 F.3d 385, 392 (6th Cir.1993) ("Driving with no visible license plate is a violation of Memphis City Ordinance § 21–269. Officer Writesman testified that he noticed before he stopped the car that it did not have a visible license plate and that he recognized that this was a violation of law. Therefore, Officer Writesman clearly had probable cause to stop the vehicle for

the traffic violation of driving with no visible license plate.").

Bergquist's conclusion need not have been "ironclad" or even "highly probable"; it needed only have been "reasonable" to satisfy the standard of probable cause. *United States v. Winchenbach,* 197 F.3d 548, 555–56 (1st Cir.1999); *see also, e.g., Roche v. John Hancock Mut. Life Ins. Co.,* 81 F.3d 249, 255 (1st Cir.1996) ("[O]ne who asserts the existence of probable cause is not a guarantor either of the accuracy of the information upon which he has reasonably relied or of the ultimate conclusion that he reasonably drew therefrom.").

This is the end of the analysis. The following simply are irrelevant:

1. Laurie Adams' KTP dealings. The government does not rely on the firearms-purchase suspicions to establish probable cause for the car stop. *See* Response at 5–9.

2. Events subsequent to the stop, including Laurie Adams' statements and Bergquist's discovery that the license plate in question was indeed properly attached. *See, e.g., United States v. Dexter,* 165 F.3d 1120, 1124 (7th Cir.1999) ("Dexter argues that the van in which he was riding was not in violation of the traffic laws at the time Trooper Lewis stopped the van and, therefore, the stop was illegal. The major difficulty with Dexter's argument is that regardless of whether or not he was violating the law, the stop was justified if Trooper Lewis had probable cause to believe a violation had occurred."); *Roche,* 81 F.3d at 254 ("The inquiry into the existence *vel non* of probable cause is not to be undertaken from the perspective of hindsight but from the perspective of a hypothetical 'reasonable man' standing in the reporting person's shoes at the time when that person acted.").

3. The subjective state of mind of the police, including their desire to find a reason to stop the Jetta if possible. *See, e.g., Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("We think these cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").[3]

■ Nor was the subsequent search of the Jetta or seizure of firearms from beneath the driver's seat impermissible. Bergquist's roadside search was justified, at the least, as a search incident to the arrest of Adams for operating a vehicle without a license, the validity of which Adams does not challenge. *See, e.g., United States v. Infante–Ruiz,* 13 F.3d 498, 502 n. 1 (1st Cir.1994) ("[W]hen a police officer makes a lawful custodial arrest of the occupant of an automobile, the officer may, as a contemporaneous incident of that arrest, search the car's passenger compartment and any containers found within it. The 'passenger compartment' has been interpreted to mean those areas reachable without exiting the vehicle and without

---

**3.** Adams cites *United States v. Curzi,* 867 F.2d 36, 43 n. 6 (1st Cir.1989), for the proposition that circumstances deliberately created by the police cannot justify a warrantless search. However, in *Curzi* the police created the exi-gent circumstances later used to justify their intrusion. *Id.* In this case, Bergquist did not "create," but rather discovered, the circumstances leading to stop of the Jetta.

dismantling door panels or other parts of the car.") (citations and internal quotation marks omitted).

 Alternatively, the search was justified by probable cause to believe (based on Laurie Adams' statements) that she was committing the offense of carrying a loaded weapon in her vehicle without a concealed-weapons permit. *See* 25 M.R.S.A. § 2001(1) (person may not "wear under his clothes or conceal about his person" a firearm unless, *inter alia,* person has a valid permit to carry a concealed firearm); 12 M.R.S.A. §§ 7406(9–A)(B) & (20)(A)(2) (person may not carry a loaded firearm in or on a motor vehicle without concealed weapons permit covering firearm in question); *see also, e.g., United States v. Staula,* 80 F.3d 596, 602 (1st Cir.1996) ("A police officer may effect a warrantless search of the interior of a motor vehicle on a public thoroughfare as long as he has probable cause to believe that the vehicle contains contraband or other evidence of criminal activity."). Having found the loaded weapons and having been given no concealed-weapons permit covering them, Bergquist was justified in seizing them on the basis of their apparently illegal transport.

For these reasons, the motion to suppress the car stop of October 8, 2001 and its fruits should be denied.

**B. Motion To Suppress Statements**

Adams, finally, moves to suppress any statements purportedly made to Greenwood and Davis on March 18, 2002 on the basis that the detectives' offers of leniency constituted psychological coercion of a type that undermined the voluntariness of his confessions. Memorandum/Statements at 3.[4]

In so arguing Adams relies heavily on a formulation of the voluntariness test drawn from *Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897), in which the Supreme Court embraced the proposition that "a confession, in order to be admissible, must be free and voluntary; that is . . . [not] obtained by any direct or implied promises, however slight[.]" *See* Memorandum/Statements at 2–3 (quoting *Bram*).

As the government points out, this no longer is an entirely accurate statement of the law. *See* Response at 14–15; *see also, e.g., United States v. Jackson,* 918 F.2d 236, 242 (1st Cir.1990) ("Although *Bram* has not been overruled, it has been modified. The Congress and the courts have indicated that to determine voluntariness it is necessary to look at the totality of the circumstances, *including* any promises and threats made by police officers or the prosecution, in order to see whether the will of the accused was overborne.") (emphasis in original).

 The government has the burden of proving, by a preponderance of the evidence, that a challenged confession was in fact given voluntarily. *See, e.g., Jackson,* 918 F.2d at 241. In determining whether a defendant's will was overborne, some of the factors taken into account have been the age of the accused, his education or his intelligence, whether he was advised of his constitutional rights, the length of detention, the nature of the questioning and whether physical punishment was used. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The government meets its burden in this case.

Adams appeared intelligent, rational and calm—even joking with the detectives.

---

4. Adams does not concede that he made the statements attributed to him regarding the robberies in question. Memorandum/Statements at 2 n. 1.

He was advised of his *Miranda* rights. He did not appear to be under the influence of intoxicants or in any physical discomfort. The interview was held at a reasonable hour of day (approximately 5 p.m.), lasted for a reasonable amount of time (about one hour) and Adams was dressed in street clothes, provided with a cold drink and unencumbered by handcuffs, leg irons or other restraints. Tellingly, Adams denied the use of firearms in the robberies in question, indicating that he was making voluntary, strategic choices.

Most importantly, the evidence adduced at hearing failed to bear out Adams' core premise—that his will was overborne by virtue of the detectives' promises of leniency. While the detectives did indeed imply that things likely would go better for Adams if he cooperated, no "promise" was made. Even actual promises of leniency do not *per se* render a confession involuntary. *See, e.g., Coombs v. State of Maine,* 202 F.3d 14, 19 (1st Cir.2000) (noting, in habeas case, that "it is less apparent to us than to the Maine Law Court that if a promise had been made it automatically would have rendered the confession involuntary"); *United States v. Byram,* 145 F.3d 405, 408 (1st Cir.1998) ("[I]t would be very hard to treat as *coercion* a false assurance to a suspect that he was not in danger of prosecution.") (emphasis in original). In this case, the detectives' representations that they would relay Adams' "cooperation" to the district attorney's office and that things likely would go better for him (in some vague, undefined fashion) as a result, did not undermine the voluntariness of Adams' purported confession. *See, e.g., United States v. Ruggles,* 70 F.3d 262, 265 (2d Cir.1995) ("Certainly, statements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive. Statements such as

these are merely common sense factual observations.") (citations omitted).

For these reasons, Adams' motion to suppress statements should be denied.

### III. Conclusion

For the foregoing reasons, I recommend that the defendant's motions to suppress evidence be **DENIED.**

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which* de novo *review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to* de novo *review by the district court and to appeal the district court's order.*

October 7, 2002.